DIANE M. LEDOUX, APPELLEE, V. EDWARD L. LEDOUX, APPELLANT.

452 N.W.2d 1

Filed February 23, 1990.   No. 88-172.

John J. Respeliers and Thomas K. Harmon, of Respeliers & DeMari, for appellant.

Alan G. Stoler for appellee.

Carolyn R. Wah for amicus curiae Watchtower Bible & Tract Society of New York, Inc.

Hastings, C.J., Boslaugh, White, Caporale, Shanahan, Grant, and Fahrnbruch, JJ.

Per Curiam.

The appellant, Edward L. LeDoux, a noncustodial father, claims that the Douglas County District Court erred in entering a marriage dissolution decree that restricted religious activities between himself and his children.

In the decree, the trial court ordered LeDoux, a Jehovah's Witness, to refrain from exposing or permitting any other person to expose his minor children to any religious practices or teachings inconsistent with the Catholic religion. The court

further ordered that while visiting their father, the children be permitted to engage in activities normally permitted by the Catholic religion. LeDoux contends that the dissolution decree is contrary to law and the evidence. He further complains about the length of summer visitations. Lack of longer summer visitations was not assigned as error and will not be considered on appeal. See *Federal Land Bank of Omaha v. Victor*, 232 Neb. 351, 440 N.W.2d 667 (1989). We affirm.

Child custody determinations are matters initially entrusted to the discretion of the trial court, and although the Supreme Court reviews these cases de novo on the record, the trial court's determination will normally be affirmed in the absence of an abuse of discretion. *Miles v. Miles*, 231 Neb. 782, 438 N.W.2d 139 (1989). The same standard of review applies to visitation determinations by the trial court.

Edward LeDoux and Diane M. LeDoux were married on July 30, 1977, at St. Adalbert's Catholic Church in Omaha. Two children were born during the marriage, Andrew Davis LeDoux, born July 20, 1981, and Peter Kyle LeDoux, born January 9, 1985. Both were baptized in the Catholic faith. At the time of trial, Andrew was attending St. Cecelia's grade school, a Catholic parochial school in Omaha. In July 1985, Edward LeDoux began worshiping as a Jehovah's Witness. Diane and Edward LeDoux separated on April 1, 1986.

On April 17, 1987, Diane LeDoux filed a petition for legal separation, requesting custody of the minor children. She moved that Edward LeDoux's visitation rights with the parties' children be restricted and structured. Following a hearing on Diane LeDoux's motion, the trial court entered a temporary order on April 29, 1987, granting Edward LeDoux reasonable rights of visitation. He was ordered not to involve the minor children in any of his religious activities. A subsequent motion filed by appellant requesting that his minor children accompany him to religious services was denied by the trial court. Edward LeDoux in a cross-petition asked for dissolution of the marriage.

At trial, the principal contested issue dealt with visitation rights and specific restrictions Diane LeDoux wished to permanently impose upon appellant with regard to his religious

activities with the minor children.

Evidence was adduced concerning appellant's religious beliefs and their effect on the minor children. Diane LeDoux testified to various incidents in the family home brought on by the beliefs of appellant. Prior to the parties' separation, Edward LeDoux asked Andrew to say grace. The boy started to recite the "Hail Mary," a Catholic prayer. Appellee testified, "Ed got so mad and told him, 'How dare you, how dare you say that.' He got up and he dumped his chair over, and he went into the living room and . . . stared into space for 45 minutes." On Valentine's Day of 1986, Edward LeDoux refused to do anything with his family, and on Christmas of 1986, appellant "said he was going to rip up all the Christmas stuff and . . . throw it out." Appellee further recounted an incident on Easter of 1987, when "Ed wanted to come into the house and take the kids to a memorial service. He came into the house and went up to Andy's room and grabbed him by the arm and wouldn't let him go. We had an argument. I finally had to call the police, and they came and talked him home."

Scott S. McQuin, an elder in the Jehovah's Witnesses church, agreed that there were differences between the Jehovah's Witnesses faith and other religions. McQuin stated the following differences: Jehovah's Witnesses go door to door carrying on religious conversations with people to encourage interest in the Bible. Members of the Jehovah's Witnesses religion are counseled strongly against allowing their children to participate in sports activities with people outside the congregation, and the children are discouraged from participation in organizations such as Cub Scouts or Boy Scouts. Parents would be strongly counseled about the dangers involved in being in those kinds of organizations. Jehovah's Witnesses encourage higher education for vocational purposes only, not to advance philosophical teachings. In addition, McQuin stated that Jehovah's Witnesses observe only one holiday, that being the memorial of the death of Jesus Christ, and they believe that patriotism is divisive.

Dr. Joseph L. Rizzo, a certified clinical psychologist who had counseled Andrew, was called to testify by the appellee. He indicated that conflicts in the Catholic and Jehovah's Witnesses

religions were an obvious contributing factor to the stress felt and manifested by Andrew. Dr. Rizzo testified that Andrew was quite uncomfortable and fearful about visits with his father. "[Andrew] spoke very strongly about the father trying to get him — trying to read him religious stories and trying to get him to pray, and things of this nature."

Dr. Rizzo said he became concerned when he learned that Andrew had voluntarily skipped visits with the appellant. "Andy was angry, and Andy stated that he basically didn't want to be with Dad . . . ." Dr. Rizzo said that Andrew's specific concerns with regard to his father would come and go throughout the period of several months, "the concerns of whether or not the father would play with Andy, whether or not the father would pray, would do religious things that Andy felt he was not supposed to do."

Andrew attended the scheduled visitations with appellant on September 16, 1987, September 18 through 20, 1987, and again on September 23, 1987. However, following each visit Andrew wet himself and had the equivalent of a nightmare. Dr. Rizzo concluded that "those are reflections of stress applications, unless something unusual physically is happening." When asked whether it would be in the best interests of Andy to participate in religious activities with his father at the present time, Dr. Rizzo testified:

> Andy does not feel comfortable with his father. . . . Andy is avoiding his father.
>
> Andy is familiar with the things that a young child does, and Andy is familiar with the kind of church services he goes to. . . .
>
> . . . I believe he would, therefore, avoid going to the services with him. And he has been very strong in that.
>
> . . . .
>
> . . . [T]he religious aspect would be a part of it. And, frankly, Andy is not open to hardly anything positive from his father right now.
>
> I believe strongly that Andy wonders whether or not Dad really is willing to accept Andy for the kid he is and, therefore, "Will Dad do the things that I'm interested in rather than doing the things that Dad is interested in?"

When asked whether he felt long periods of visitation between Andrew and appellant would have an effect on Andrew, Dr. Rizzo testified that "without any further development and work between Andy and his father, I do believe Andy would experience very substantial stress. And I really firmly believe he wouldn't tolerate the visitation more than a few days."

On cross-examination, Dr. Rizzo admitted that Diane LeDoux could have imparted some of her strong feelings and objections to appellant's religion to Andrew, "but I think also clearly some of this could be childlike misperceptions on Andy's part himself." When asked whether there is something seriously threatening Andrew's health, Dr. Rizzo answered, "I believe that Andy is diagnosable of having a maladjustment problem currently. Yes, he is under stress. Yes, it is serious. It is not the most serious, but it is significant . . . ." Dr. Rizzo concluded that religion, particularly appellant's religion, is one of the factors that has caused the stress that Andrew is experiencing.

The trial court found that there were numerous beliefs and practices of Jehovah's Witnesses which were in contravention of those of the Catholic religion. In addition, the trial court noted that Edward LeDoux wants to take his children with him when he goes door to door to have Bible discussions with other people. Edward LeDoux stated that he wants his children to believe the way that he does. The trial court did not pass judgment on these or any other beliefs of the Jehovah's Witnesses, but did not ignore that these beliefs were still contrary to the way that Diane LeDoux, the custodial parent, wants to raise the children. Taking note of the stress that Andrew was already experiencing, the trial court concluded that exposing the minor children to more than one religious practice would have a deleterious effect upon the minor children. The court found that exposing the children to two religions would not only affect the relationship between Edward LeDoux and the minor children, but also would affect the well-being of the minor children themselves.

In a decree entered December 17, 1987, the trial court placed custody of the parties' two minor children with appellee. After establishing a specific visitation schedule, the trial court

directed appellant not to "expose or permit himself or any other person to expose the minor children of the parties to any religious practices or teachings that are inconsistent with the religious teachings espoused by the [appellee], being the Catholic religion by which the children are being raised." The trial court further ordered that at such times as the children were in appellant's possession during visitation, appellant could not prevent or preclude the minor children from engaging in activities normally permitted by the Catholic religion.

The free exercise clause of the first amendment to the U.S. Constitution forecloses governmental regulation of religious beliefs. "Government may neither compel affirmation of a repugnant belief . . . nor penalize or discriminate against individuals or groups because they hold religious views abhorrent to the authorities . . . ." *Sherbert v. Verner*, 374 U.S. 398, 402, 83 S. Ct. 1790, 10 L. Ed. 2d 965 (1963). Courts must preserve an attitude of impartiality between religions and may not disqualify a parent solely because of his or her religious beliefs. *Burnham v. Burnham*, 208 Neb. 498, 304 N.W.2d 58 (1981); *Goodman v. Goodman*, 180 Neb. 83, 141 N.W.2d 445 (1966).

Although the prohibition against infringement of religious belief is absolute, the immunity afforded religious practices by the first amendment is not so rigid. A state may abridge religious practices upon a demonstration that some compelling state interest outweighs a complainant's interests in religious freedom. *Sherbert v. Verner, supra*. See, also, *Cantwell v. Connecticut*, 310 U.S. 296, 60 S. Ct. 900, 84 L. Ed. 1213 (1940).

The paramount consideration in all cases involving the custody or visitation of a child is the best interests of the child. Neb. Rev. Stat. § 42-364 (Reissue 1988). See, also, *Ensrud v. Ensrud*, 230 Neb. 720, 433 N.W.2d 192 (1988). Courts have a duty to consider whether religious beliefs threaten the health and well-being of a child. *Burnham, supra*. See, also, *Morris v. Morris*, 271 Pa. Super. 19, 412 A.2d 139 (1979); *Munoz v. Munoz*, 79 Wash. 2d 810, 489 P.2d 1133 (1971). Prohibiting a court from considering " 'religious factors under any circumstances would blind courts to important elements bearing on the best interests of the child.' " *Burnham, supra* at

502, 304 N.W.2d at 61 (quoting *Bonjour v. Bonjour*, 592 P.2d 1233 (Alaska 1979)). "The right to practice religion freely does not include liberty to expose . . . the child to . . . ill health . . . ." *Prince v. Massachusetts*, 321 U.S. 158, 166-67, 64 S. Ct. 438, 88 L. Ed. 645 (1944). Thus, when a court finds that particular religious practices pose an immediate and substantial threat to a child's temporal well-being, a court may fashion an order aimed at protecting the child from that threat. *Osier v. Osier*, 410 A.2d 1027 (Me. 1980) (citing *Sherbert v. Verner, supra*, and *Levitsky v. Levitsky*, 231 Md. 388, 190 A.2d 621 (1963)). See, also, *Goodman v. Goodman, supra; Matter of Bentley v Bentley*, 86 A.D.2d 926, 448 N.Y.S.2d 559 (1982). In so doing, a court must narrowly tailor its order so as to result in the least possible intrusion upon the constitutionally protected interests of the parent. *Osier, supra.*

A de novo review of the record discloses no abuse of discretion on the part of the trial court. There is ample evidence to conclude that the stress Andrew was experiencing posed an immediate and substantial threat to his well-being. The stress that Andrew was experiencing was neither hypothetical nor tenuous. In Dr. Rizzo's words, Andrew's stress is serious. The fact that the involuntary exposure to disparate religions was but one factor in the source of Andrew's stress does not detract from the trial court's conclusion that these religious differences have and will continue to have a deleterious effect on Andrew and, likewise, the other minor child, Peter.

The order of the trial court is narrowly tailored in that it imposes the least possible intrusion upon Edward LeDoux's right of free exercise of religion and the custodial mother's right to control the religious training of a child. The custodial parent normally has the right to control the religious training of the child. *Goodman v. Goodman, supra.* The dissolution decree merely forecloses the exposure of the LeDoux children to those practices and teachings which are inconsistent with the Catholic religion. The appellant is free to discuss beliefs of the Jehovah's Witnesses with his children so long as they are consistent with the Catholic religion. Because appellant has had previous exposure to the Catholic religion, he should not have difficulty in recognizing those beliefs of the Jehovah's Witnesses and

Catholic religions which are conflicting.

AFFIRMED.

GRANT, J., concurring.

I concur fully in the court's opinion and holding. I write only to add that I see no reason why a court should not use its common sense in applying the command of Neb. Rev. Stat. § 42-364 (Reissue 1988) that "visitation of minor children shall be determined on the basis of their best interests." I do not see how one parent with one set of religious beliefs and one parent with a different, conflicting set of religious beliefs can raise their minor children with full training and instruction in each parent's beliefs without reducing their minor children to a totally confused, psychologically disastrous state. The trial court in this case was not promoting one religion over another, but was trying to so act that these young children could retain their sanity and survive mentally to an adult age when they could choose their own beliefs. In view of the best interests of the children, I see no error, constitutional or otherwise, in the trial court's actions.

HASTINGS, C.J., and BOSLAUGH, J., join in this concurrence.

FAHRNBRUCH, J., concurring.

I concur with the majority opinion. The parents' religious conflict has clearly detrimentally affected the general welfare of the older child. Because of the magnitude and intensity of the conflict, it not only likely will, but inevitably will, detrimentally affect the general welfare of the younger child. The majority opinion protects the welfare of the LeDoux children by adhering to the prior holdings of this court that the custodial parent normally has the right to control the religious training of the children of a marriage. *Goodman v. Goodman*, 180 Neb. 83, 141 N.W.2d 445 (1966). See, also, *Burnham v. Burnham*, 208 Neb. 498, 304 N.W.2d 58 (1981).

SHANAHAN, J., dissenting.

The majority wanders into theological smoke from the fire of fervent faith fueled by divergent dogma and eventually emerges grasping a solution referenced to religion rather than legal rationale.

The trial court's order restricting religious contact and

communication between Edward LeDoux and his children undeniably infringes on religious freedom inherent in the parent-child relationship. The question is whether the order, religiously restrictive and affirmed by this court, is a permissible invasion of Edward LeDoux's religious freedom or free exercise of religion guaranteed by the first amendment to the U.S. Constitution and article I, § 4, of the Nebraska Constitution.

The 1st amendment to the U.S. Constitution applies to the states through the 14th amendment to the U.S. Constitution. *Cantwell v. Connecticut*, 310 U.S. 296, 60 S. Ct. 900, 84 L. Ed. 1213 (1940).

Free exercise of religion, guaranteed by the first amendment to the U.S. Constitution, is protected from unconstitutionally applied state power, whether judicial or legislative. See *N. A. A. C. P. v. Alabama*, 357 U.S. 449, 78 S. Ct. 1163, 2 L. Ed. 2d 1488 (1958). Beyond question, "the free exercise of religion is a fundamental constitutional right." *Johnson v. Robison*, 415 U.S. 361, 375 n.14, 94 S. Ct. 1160, 39 L. Ed. 2d 389 (1974). Free exercise of religion, of course, does not mean that a state, through appropriate judicial or legislative action, may never interfere in a private religious matter, for, as the Supreme Court has expressed:

> The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest. However, it is still true that "[t]he essence of all that has been said and written on the subject is that only those interests of the highest order . . . can overbalance legitimate claims to the free exercise of religion."

*Thomas v. Review Bd., Ind. Empl. Sec. Div.*, 450 U.S. 707, 718, 101 S. Ct. 1425, 67 L. Ed. 2d 624 (1981) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972)).

Moreover, in addition to constitutional considerations, a modicum of pragmatism dictates that "[c]ourts should proceed cautiously and with circumspection when dealing with religious issues." *Khalsa v. Khalsa*, 107 N.M. 31, 36, 751 P.2d 715, 720 (1988). "[I]ntervention in matters of religion is a perilous

adventure upon which the judiciary should be loathe to embark." *Wojnarowicz v. Wojnarowicz*, 48 N.J. Super. 349, 354, 137 A.2d 618, 621 (1958).

Before today, this court had never directly dealt with the question whether a child's noncustodial parent who has religious tenets contradictory to those of the custodial parent may be judicially precluded from communicating the contradictory religious information to a child involved in a marital dissolution. In *Goodman v. Goodman*, 180 Neb. 83, 141 N.W.2d 445 (1966), this court recognized that there must be judicial impartiality toward conflicting religious beliefs of a child's parents in a marital dissolution proceeding and then expressed a general rule that the custodial parent ordinarily determines the religious training of a child. However, the *Goodman* court stated: "We question whether even a noncustodial parent might legally be, or should be, enjoined from imparting religious instruction to his child in the absence of a showing of serious threat to the health or well-being of the child." *Id.* at 89, 141 N.W.2d at 449.

Whether a noncustodial parent in a marital dissolution proceeding may be enjoined from religious communication with a child of the noncustodial parent, a question raised but unanswered in *Goodman*, has been addressed by several courts outside Nebraska. For example, in *In re Marriage of Murga*, 103 Cal. App. 3d 498, 504-05, 163 Cal. Rptr. 79, 82 (1980), the court observed that

> in the majority of American jurisdictions that have considered the question, the courts have refused to restrain the noncustodial parent from exposing the minor child to his or her religious beliefs and practices, absent a clear, affirmative showing that these religious activities will be harmful to the child. . . . The refusal to intervene in the absence of a showing of harm to the child reflects the protected nature of religious activities and expressions of belief, as well as the proscription against preferring one religion over another.

As the court noted in *Munoz v. Munoz*, 79 Wash. 2d 810, 812-13, 489 P.2d 1133, 1135 (1971):

> The courts are reluctant . . . to interfere with the

religious faith and training of children where the conflicting religious preferences of the parents are in no way detrimental to the welfare of the child. The obvious reason for such a policy of impartiality regarding religious beliefs is that, constitutionally, American courts are forbidden from interfering with religious freedoms or to take steps preferring one religion over another. [Citations omitted.]

. . . .

Thus, the rule appears to be well established that the courts should maintain an attitude of strict impartiality between religions and should not disqualify any applicant for custody or restrain any person having custody or visitation rights from taking the children to a particular church, except where there is a clear and affirmative showing that the conflicting religious beliefs affect the general welfare of the child.

See, also, *Hanson v. Hanson*, 404 N.W.2d 460, 463 (N.D. 1987): "[M]ost courts . . . have refused to restrain a noncustodial parent during visitation periods from exposing the minor child to his or her religious beliefs and practices, absent a clear, affirmative showing that these religious activities will be harmful to the child."

Furthermore, harm that justifies a restrictive infringement of a parent's constitutionally protected freedom of religious expression "should not be simply assumed or surmised; it must be demonstrated in detail." *Felton v. Felton*, 383 Mass. 232, 234, 418 N.E.2d 606, 607 (1981). See, also, *Hanson v. Hanson, supra.* Similarly, a judicial finding that a noncustodial parent's religion has a detrimental effect on a child cannot be based on "mere conjecture," *Morris v. Morris*, 271 Pa. Super. 19, 412 A.2d 139, 144 (1979), or "mere conclusions and speculation," *Robertson v. Robertson*, 19 Wash. App. 425, 427, 575 P.2d 1092, 1093 (1978).

In *Felton v. Felton, supra,* the court considered the question whether or how to accommodate diverse religious practices of parents, living apart, in the upbringing of a minor child and stated:

The parents together have freedom of religious expression

and practice which enters into their liberty to manage the familial relationships. [Citations omitted.] But the "best interests" of the child are to be promoted, and when the parents are at odds, the attainment of that purpose may involve some limitation of the liberties of one or other of the parents. . . .

If the dominating goal of the enterprise is to serve a child's best interests . . . then it might be thought to follow that a policy of stability or repose should be adopted by which the child would be exposed to but one religion (presumably that of the custodial parent) at whatever cost to the "liberties" of the other parent. The law, however, tolerates and even encourages up to a point the child's exposure to the religious influences of both parents although they are divided in their faiths. This, we think, is because the law sees a value in "frequent and continuing contact" of the child with both its parents . . . and thus contact with the parents' separate religious preferences. There may also be a value in letting the child see, even at an early age, the religious models between which it is likely to be led to choose in later life. And it is suggested, sometimes, that a diversity of religious experience is itself a sound stimulant for a child. [Citation omitted.] In all events, the question that comes to the courts is whether, in particular circumstances, such exposures are disturbing a child to its substantial injury, physical or emotional, and will have a like harmful tendency for the future. [Citation omitted.] The critical literature warns against perverting a quest for the child's best interests into one for the psychic comfort of the parents — a warning against overvaluing the parents' constitutional liberties. [Citations omitted.] A warning is equally in order against depriving a parent of all connection with the child, or connection on the religious plane, out of an exaggerated fear of injury to the child.

383 Mass. at 233-35, 418 N.E.2d at 607-08. See, also, *Compton v. Gilmore*, 98 Idaho 190, 560 P.2d 861 (1977); *Khalsa v. Khalsa*, 107 N.M. 31, 751 P.2d 715 (1988); *Morris v. Morris, supra*.

Recognizing that a court should be extremely cautious in its intervention into the religious training of a child, which is an extremely private matter, the court in *In re Marriage of Mentry*, 142 Cal. App. 3d 260, 269-70, 190 Cal. Rptr. 843, 850 (1983), stated that

> the decision to intervene must not only be conditioned upon a clear affirmative showing of harm or likely harm to the child and the exhaustion of mediation but must concomitantly reflect the considered judgment that such harm presents a graver problem than those attendant upon coercive intervention in family privacy.

With the foregoing backdrop of judicial observations and reasoning expressed by courts in other jurisdictions, the sequence of events in the LeDoux proceedings is noteworthy. On April 17, 1987, Diane LeDoux filed the petition for a legal separation from Edward LeDoux and to obtain custody of the LeDoux children, Andrew and Peter. The district court, on April 28, excluded Edward LeDoux from the family's residence and, on May 19, set a rigid schedule for Edward LeDoux's visitation of his children, a schedule which limited Edward's contact with his children to 3½ hours during 1 day of each week and visitation throughout alternate weekends.

Diane LeDoux, a Catholic, readily acknowledged that she did not want the LeDoux children to be involved in religious activities of Edward LeDoux, whose religion was Jehovah's Witnesses, because she had "done research into [Jehovah's Witnesses and] found it to be totally opposite of my religion." Diane LeDoux harbored "some rather strong feelings about religion . . . strong dislike or distaste" for Edward LeDoux's religion, conveyed her sentiments regarding Jehovah's Witnesses to 6-year-old Andrew, and went so far as to tell Andrew that the Jehovah's Witnesses "would mess up his [Andrew's] mind just like they messed up the mind of his father." Also, Diane LeDoux told Andrew that "his father is not supposed to show him any books" or discuss religion and Bible stories with him.

In mid-May 1987, Diane LeDoux took Andrew to Dr. Rizzo, a psychologist, who observed that the child was "a very bright, precocious, verbal child, very energetic, very active, high drive;

and, yet, during the course of my time with him, he was very anxious, uncomfortable, at times angry, angry about the situation in terms of his father and, on occasion, was angry with myself as well."

At trial, in answer to the question "Is it unusual that people have some difficulty in adjusting to divorce, men, women, and children?" Dr. Rizzo responded: "Of course not." On the subject of Andrew's "stress," cross-examination by Edward LeDoux's lawyer produced the following:

Q. . . . Doctor, do children have difficulty sometimes adjusting to divorce, separation from their father or mother?

A. Certainly.

Q. And sometimes they get angry about it?

A. Yes.

Q. And sometimes they blame one parent over the other, don't they?

A. Yes.

Q. Particularly blame the parent who leaves the house, leaves the family?

A. That does happen.

. . . .

Q. Do you think it's possible that Andy might be angry at [his father], might be misfocusing or confused and having some difficulty in adjusting to the fact that he's five years old and his father has left?

A. There's no doubt in my mind that Andy is very angry with his father and that truly the issue of religion could become an unnecessary stumbling block.

Dr. Rizzo further testified that "from a relational standpoint, [Andrew] felt that being with his father was not a lot of fun" and that

with Andy being as bright as he is and also being very energetic, he requires a lot of intense time; and that one has to find things that he's interested in and be willing to shift and get into different activities, perhaps, when you're sitting down and playing with him every 15 minutes.

According to Dr. Rizzo, Andrew "didn't feel that Dad played

with him the way he wanted him to play; that Dad did the things he wanted to do, not the things that Andy wanted to do."

Also, Dr. Rizzo testified that Andrew "spoke very strongly about [Edward LeDoux's] trying to get him [Andrew] — trying to read him religious stories and trying to get him to pray, and things of this nature," and that Andrew was "afraid that his father was going to . . . force him to pray, force him to read religious books" when Diane LeDoux had told Andrew that "his father was not supposed to do that." When asked whether Andrew was "mouthing the beliefs of his mother when [Andrew] talks about Jehovah's Witnesses," Dr. Rizzo responded, "I would have to say there is no doubt that the child is probably mouthing some of those things" which had been "put into his ears by his mother."

In further cross-examination of Dr. Rizzo, the following exchange occurred:

Q. Isn't that the source of his stress, though, the fact that his mother has told him one way and his father another?

A. Yes.

Q. With regard to religion?

A. Certainly, religion.

Q. And if one of them would stop pulling, there wouldn't be the stress; isn't that correct?

A. Or if they both came to some other ground, certainly.

. . . .

Q. Would the stress that you told us about be removed if neither party said anything about religion to the child?

A. Well, the issue of stress would be gone; but, then, the issue of the relationship would emerge as the primary issue.

Q. And the relationship during divorce is sometimes, I think you told us, difficult?

A. Yes.

Q. Particularly for the parent that moves out?

A. Yes.

Q. And it takes some time to reestablish that relationship?

A. Yes.

Concerning Andrew's bed-wetting in the fall of 1987, Dr. Rizzo expressed the opinion that "the wetting experiences were reflecting the stress that Andy was feeling for being with his father during visitation when he hadn't seen Dad for some time for overnight; so it was his experience of stress at that time."

Dr. Rizzo acknowledged that part of Andrew's stress was attributable to the fact that Andrew was "very highly sensitive to his father probably saying anything about religion, any kind of mention about prayer, any kind of mention of a book," after Diane LeDoux had informed Andrew that his father was not supposed to show him any books, including Bible stories, or discuss religion with Andrew. However, Dr. Rizzo also acknowledged that with the cooperation of parents, a child might be introduced to two different religions in a manner which would not be stressful.

From the foregoing evidence, one cannot reach the reasonable conclusion, based on a clear and affirmative showing, that Edward LeDoux's religious activities, in and of themselves, are, or will be, harmful to Andrew LeDoux. See, *Khalsa v. Khalsa*, 107 N.M. 31, 751 P.2d 715 (1988) (general testimony about the parents' conflicting religious beliefs which caused a child to be upset or confused is insufficient to demonstrate harm to a child and justify prohibition of a noncustodial parent's religious instruction to the child); *Hanson v. Hanson*, 404 N.W.2d 460 (N.D. 1987) (possibility that noncustodial parent's religion may strain the parent-child relationship falls short of the necessary clear and affirmative showing of harm to justify restriction on the noncustodial parent's expression of religious beliefs); *Morris v. Morris*, 271 Pa. Super. 19, 412 A.2d 139 (1979) (judicial inquiry regarding a parent's religious belief in reference to child custody and visitation is limited to determining whether a religious belief or practice has a detrimental effect on a child); *Robertson v. Robertson*, 19 Wash. App. 425, 575 P.2d 1092 (1978) (child's alarm at parental religious beliefs is insufficient to justify an order restricting the noncustodial parent's religious instruction of the child); *Compton v. Gilmore*, 98 Idaho 190, 560 P.2d 861 (1977) (a child's unusual behavior after visiting the

noncustodial parent was attributable to the occurrence of visitation as an occasion or opportunity to express parental conflict and was unattributable to the noncustodial parent's religious practices); *Munoz v. Munoz*, 79 Wash. 2d 810, 489 P.2d 1133 (1971) (duality of religious beliefs does not per se create a conflict in a child's mind).

For some unexplained reason, this court's majority recounts testimony that "Jehovah's Witnesses observe only one holiday, that being the memorial of the death of Jesus Christ, and they believe that patriotism is divisive." As the court remarked in *Levitsky v. Levitsky*, 231 Md. 388, 398, 190 A.2d 621, 626 (1963):

> There are a number of cases holding that the fact that a parent teaches a child religious doctrines which are at variance with those of the majority is not a ground for a change of custody, and this rule has been applied in cases involving Jehovah's Witnesses and their tenets against saluting the flag, military service and the observance of Christmas, or one or more of those matters.

If religious beliefs in Jehovah's Witnesses regarding military service, flag-saluting, and observance of Christmas are insufficient or impermissible bases to change child custody, as pointed out in *Levitsky*, those religious beliefs and practices are impotent for the initial determination of child custody. Furthermore, "[q]uestions regarding the celebration of Christmas and birthdays or relating to participation in the electoral process or military service are not within the ambit of religious views which may reasonably be construed as endangering the mental or physical health of the child." *Clift v. Clift*, 346 So. 2d 429, 435 (Ala. Civ. App. 1977). In LeDouxes' case, nothing established that tenets of Jehovah's Witnesses concerning holidays or patriotism are detrimental to the LeDoux children. For that reason, reference to any religious perspective of holidays or patriotism is intellectually offensive and legally irrelevant to a rational resolution of the child visitation issue.

There is another curious consequence of the conclusion reached by the majority of this court. Concerning visitation of the LeDoux children, the trial court ordered that Edward

LeDoux "shall not expose or permit himself or any other person to expose the minor children of the parties to any religious practices or teachings that are inconsistent with the religious teachings espoused by [Diane LeDoux], being the Catholic religion by which the children are being raised." That order, the majority believes, is "narrowly tailored" to impose the "least possible intrusion" on Edward LeDoux's right to free exercise of his religion and Diane LeDoux's right to determine religious training for the LeDoux children. An order quite similar to that reviewed in LeDouxes' case existed in *Felton v. Felton*, 383 Mass. 232, 237, 418 N.E.2d 606, 609 (1981), where the father, a member of Jehovah's Witnesses and the noncustodial parent, was granted child visitation " 'provided that he refrains from giving his children any religious training or education which shall be in conflict or contrary with the religious training and beliefs of the custodial parent,' " a member of the Congregational Church. With practical perspicacity, the *Felton* court noted that the child visitation order "on its face would require subtle interpretation and raise infinite difficulties of enforcement." 383 Mass. at 237, 418 N.E.2d at 609.

*Morris v. Morris*, 271 Pa. Super. 19, 412 A.2d 139 (1979), is an illustration of a narrowly tailored child visitation order, when a noncustodial parent's religious beliefs or practices cause detriment to a child. In *Morris*, the child, a baptized Catholic, was in custody of her mother and would probably, although not necessarily, be psychologically damaged as the result of the child's accompanying her father, the noncustodial parent, during his door-to-door dissemination of doctrine embraced by Jehovah's Witnesses. The trial court prohibited the father from taking the child on such door-to-door proselytistic endeavors. In upholding the restriction in the visitation order, the *Morris* court commented: "The order is, at any rate, quite liberal. Appellant is not prohibited from seeing [his daughter], nor from discussing his beliefs with her, but only from forcing her to accompany him on his door-to-door visits." 412 A.2d at 147.

This court's majority attempts to avoid the subtle interpretations and infinite difficulties in enforcement of the LeDoux visitation order by bootstrapping the certainty which is

necessary for enforceability of the visitation order:

> [Edward LeDoux] is free to discuss beliefs of the Jehovah's Witnesses with his children so long as they are consistent with the Catholic religion. Because [Edward LeDoux] has had previous exposure to the Catholic religion, he should not have difficulty in recognizing those beliefs of the Jehovah's Witnesses and Catholic religions which are conflicting.

While the boundless breadth of the restrictive child visitation order in the present appeal may engender countless quodlibets concerning the dichotomy of dogma between Jehovah's Witnesses and Catholicism, resort to Edward LeDoux's comprehension of Catholicism is hardly an objective standard for evaluating whether there is compliance or noncompliance with the visitation order, renders a catechism indispensable for a proceeding to punish contempt of court or change existing visitation rights, and, in quintessential imprudence, casts a judge in the role of a theological umpire.

What the majority has characterized as a "narrowly tailored" visitation order is, in reality, a judicial straitjacket, constricting Edward LeDoux and preventing him from discussing with his children any religious belief or practice which may contradict or conflict with Catholic doctrine. Thus, the LeDoux visitation order prohibits Edward LeDoux's free exercise of his religion in reference to his children and, consequently, constitutes a denial of religious freedom protected by the state and federal Constitutions.

In summary and conclusion, dissolution of the LeDoux marriage was traumatic to all concerned, parents as well as children. Yet, it was Diane LeDoux's distaste or dislike for Jehovah's Witnesses doctrine and her intense indoctrination of the children, especially Andrew, which resulted in Andrew's reactive disturbance when he was confronted with his father's activities of a religious nature, paternal conduct that had been maternally condemned as something which Edward LeDoux was not "supposed to do." It is all too clear that day by day Andrew had to be taught to turn away from another's religion practiced in a different way. Through such inculcation, Edward LeDoux's reading a telephone book to Andrew could be made a

taboo.

The restrictive visitation order applies to both LeDoux children, Andrew and Peter. Putting aside the fact that the testimony about possible detriment related to only one of the LeDoux children, Andrew, there is no clear and affirmative showing that any of Edward LeDoux's religious beliefs were, or would likely be, detrimental to the well-being of the LeDoux children. The religious restriction should have been excised from the child visitation order and the district court's judgment reversed accordingly.