CAROL L. PETERSON, APPELLANT AND CROSS-APPELLEE, V. ROBERT G. PETERSON, APPELLEE AND CROSS-APPELLANT.

474 N.W.2d 862

Filed September 20, 1991.   No. 90-281.

Richard K. Watts, of Mills, Mills & Papik, and Virginia G. Johnson, of The Nebraska Civil Liberties Union Foundation, for appellant.

Bruce E. Stephens and Christine P. Costantakos for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

PER CURIAM.

This is an appeal from a modification of a dissolution decree, changing custody of the parties' three minor children from the petitioner mother, Carol L. Peterson, to the respondent father, Robert G. Peterson, and ordering the mother to abstain "from any corporal punishment of the minor children and . . . from making any comments to the minor children with regard to her religious beliefs, whatsoever, under the penalties of contempt." The mother has appealed, assigning five claims of error, which merge to assert that the district court should not have (1) changed custody of the children or (2) ordered her to refrain from the use of corporal punishment and fear to force the children's obedience to the doctrines of her religion, and to abstain from discussing her religion with the children, "when a less restrictive order would suffice." The father has cross-appealed, assigning as error the district court's failure to order the mother to pay reasonable child support. We affirm as modified.

The parties were married on October 22, 1977, and have three minor children: Sadie, born to the mother on August 15, 1974, by a prior marriage and adopted by the father in 1978; Cassie, born January 4, 1979; and William, born August 11, 1983. The marriage was dissolved on February 25, 1988.

Eight months later, on October 25, 1988, the father filed an application to modify the provisions of the decree relating to the custody of the children, which application he made more definite and certain on December 2, 1988. On its own motion, the district court appointed a guardian ad litem to represent Sadie.

At the time the marriage was dissolved, the children were

attending public school in York. In October 1988, the mother enrolled the children in the York Christian Academy, which is affiliated with Good Life Pentecostal Church, the church she attends.

The academy is not accredited by the State of Nebraska and employs "monitors" instead of teachers. The monitors must complete a 1-week training course to qualify for their position and are available to answer the students' questions. The students are given workbooks, which they complete at their own pace. The schoolday at the academy begins at 8:30 a.m. From 8:30 until noon, the children work on their lessons. After a 1-hour lunch break, the children go to a nearby park to play until 2:45 p.m., unless the weather is inclement, in which case they play indoors. At 3 p.m., the children are dismissed for the day.

The guardian ad litem, who observed the academy in operation and interviewed its administrator and some of the monitors, concluded that the monitors are "not terribly actively involved on a regular basis with actually providing instruction." The monitors informed the guardian ad litem that they had not graduated from an accredited high school, but had gone through the program offered at the academy (referred to as "paces," or "ACE," in the record) and received their general equivalency diplomas. One of the monitors was taking "college level paces" at the academy, using the same method. When asked about the educational qualifications of the monitors, the mother responded that the "educational qualifications of these monitors is not pertinent to the school we run. It does not require qualified teachers under Chapter 13, we do not have to have qualified teachers." By chapter 13, the mother appears to have meant rule 13 of the State Department of Education, the exception from state accreditation under which the academy apparently operates. The mother suggests prayer for divine guidance if the monitors and the materials provided cannot help a student solve a problem.

The guardian ad litem's main concern was the method of instruction utilized by the academy. Although he had some difficulty articulating his apprehension, it appears to be that the program of the academy does not lend itself to the development

of analytical skills or independent thought—that the focus is on giving the correct answer rather than developing the methodology or thought processes by which an answer is reached. This perturbation was confirmed when Cassie, who in February 1989 had stopped living with the mother and moved in with the father, returned to the public school. (Apparently, the mother had given Cassie the option of staying with her and attending the academy or living with the father and attending the public school.) Both the principal and one of Cassie's teachers at the public school testified that upon her return, Cassie had difficulty with mathematical comprehension. The teacher seemed to believe Cassie was relying on rote memorization.

In early 1989, Cassie was expelled from the academy. According to Cassie, this was because she did not have a "really Christian attitude, and . . . was picking . . . crayons up during prayer." According to the mother, Cassie was expelled because she was a disciplinary problem. When she was expelled, the mother met Cassie at the school, took her home, and beat her with a leather belt for approximately 2 minutes. Cassie received at least 10 lashes. The mother then had her copy the definitions of "stubbornness" and "rebellion" from the dictionary, along with scriptural passages referring to rebelliousness as "a sin of witchcraft and stubbornness as an abomination unto the Lord."

When Cassie finished, the mother examined her work and found 20 errors in spelling and punctuation. Cassie was struck once with the belt for each of these scrivener's errors. After receiving 20 lashes, Cassie was required to recopy the material. This time, the mother found 10 mistakes, and Cassie was given another 10 lashes. On her third attempt at copying the material, Cassie made three mistakes and so was given three lashes with the belt. When the mother made Cassie copy the material for a fourth time, Cassie was able to do so without error. All told, Cassie was struck at least 43 times during this incident, which lasted about $4^{1}/_{2}$ hours. The mother then took Cassie to a fast-food restaurant for a treat, after which they drove around and discussed the incident.

It is worth noting that Cassie received the 43 lashes during a

period when the mother considered herself to be "very leery to spank" Cassie and "very lax" in her discipline because she was involved in a "custody suit." She testified that she believed she overlooked "a lot of things that maybe need to be punished" and that she was "probably not as consistent as [she] should be. There's probably a lot of things that get let by."

The mother does not seem to think that her actions were excessive. She felt that she "did the best that [she] could do at the time that [she] knew how to do" and did not know whether she would react the same way again. Her attitude was further evinced during her pro se cross-examination of Cassie, where the following exchange took place:

Q [by the mother] Did you feel that the punishment that was administered to you, was unfair?

A I told you that, but I didn't really feel that.

Q How many times have you told me that you didn't feel that punishment was unfair?

A Zero.

Q What?

A Zero.

Q You have never told me that you didn't feel that punishment was unfair?

A Yes.

Q What?

A Yes.

Q Yes, you have told me, or no, you haven't?

A No, I haven't.

The mother testified further that she usually gives the children "five to 10" lashes with the belt. Cassie testified that during a 1-week visit with her mother, she saw the mother give her brother six lashes with the belt "[a]bout every day." There was testimony that William told his father that in order for him, William, "to learn to be good, he had to be spanked and he had to be spanked real hard." Sadie testified that her parents spanked the children before the divorce and that when they lived in Kansas, they possessed a spanking paddle and stick, but she could only recall one instance in which the father used either of these implements on any of the children.

There was testimony that the mother is disinclined to seek or

follow medical advice. Cassie testified that the mother "doesn't believe in medicine." On one occasion, when William was sick with a 103-degree fever, the father made a doctor's appointment for the child. Although the mother took the parties' son to the doctor, she decided not to give him the medication which the doctor had prescribed. It also appears that the mother felt it was unnecessary for William to receive immunizations because "God will provide for the children." However, by the time of trial William's immunizations were current.

The mother has two jobs. She helps a disabled man, Winsor Tucker, from 3:30 to 6:30 p.m. on Mondays, Thursdays, Fridays, and Saturdays. On Tuesdays, she works at a cafe from 6:30 to 8:30 a.m., at which time she returns home to take the children to school. After taking the children to school, the mother returns to the cafe and works until 4:30 or 5 p.m. She then takes leftovers from the cafe to her children for their supper and goes to prepare supper for Tucker. On Wednesdays, she works for Tucker from 1 to 6:30 p.m. She also performs volunteer work at her church's day-care center, often opening the center at 6:30 a.m. There was testimony that the mother goes to bed at 9 p.m.

While the mother is working for Tucker, the children are left home alone. The mother testified that Sadie cooks for the other children on the nights the mother cooks for Tucker, which is usually every night except Sunday. The father testified that Sadie has "had to more or less raise" William since the dissolution and that Sadie appeared to be the primary caregiver for the other children while they were living with the mother. This testimony was reinforced by a clinical social worker called as a witness by the father, who described Sadie as "a very good mother."

Some witnesses testified that since the dissolution, the children's personal hygiene and grooming have deteriorated; other witnesses testified that the children had lost weight.

The clinical social worker spent 4 years as director of Operation Concern, "a support group designed to aid families and former cult members while going through crisis." She also attended workshops and read literature available in the mental health community on the subject of cults, as well as interviewed

"a lot of people that have been parts of these groups . . . ." As part of the preparation for testifying in the case, she interviewed the mother, father, and children.

The clinical social worker testified that approximately 40 percent of the cases in which she has been professionally involved have dealt with problems arising from involvement with religious cults. She stated that she uses 10 criteria to determine whether a group is a cult. These criteria are (1) "a very strong and powerful leader that is charismatic," (2) "the group gives power to that leader and is submissive to that leader," (3) "a rigid ideology where there is definitely right and a wrong or being of God or of Satan," (4) "physiologic deprivation in the form of either sleep deprivation . . . or food deprivation" or long hours listening to lectures or sermons, (5) isolation from family, (6) isolation or restrictions on communication from society via the media, (7) a "fair amount" of the members' income being turned over to the group, (8) some form of communal living, (9) active recruiting by group members using "love bombing" (overwhelming prospective recruits with love and affection and then conditioning that affection on acceptance of the group's beliefs), and (10) hate and fear of outsiders or looking upon them as lost souls.

In this witness' view, a group which meets 7 of the 10 criteria is a cult. She became familiar with the Good Life Pentecostal Church through interviews with people who have been involved with the church, and gave her opinion that the church meets 9 of the 10 aforementioned criteria (all except communal living) and is therefore a cult.

The clinical social worker also opined that the environment and practices fostered by the church are not conducive to the social development of the parties' children and that the practices of the church, as implemented by the mother, are detrimental to the children's emotional and psychological development. In her view, both Sadie and Cassie were being subjected to "mind control," but William was not.

The record concerning the parties' earnings is sketchy; it contains no information as to the father's earnings at the time of the subject trial, but reflects that in 1988 he had gross earnings of $23,139. The record further reflects that in that year

the mother had gross earnings of $6,408.50 and that she was earning at about the same rate at the time of trial.

The record clearly demonstrates that neither the mother nor the father is endowed with much toleration for the other's religious beliefs. The father thinks the mother is a religious fanatic and her church is a cult; on the other hand, the mother believes that all religions which believe in the Trinity, including the religion the parties shared when married, are daughters of "the great whore." While the father spent a great deal of time attempting to establish that the Good Life Pentecostal Church is a cult, whatever that might mean, notwithstanding the clinical social worker's opinion, it is neither necessary nor appropriate for us to pass judgment on that question in order to resolve the issues presented by the errors assigned by either party.

The first of the mother's summarized assignments of error asserts the district court abused its discretion by changing custody of the children from her to the father.

The mother contends that the father failed to demonstrate that there was a material change in circumstances affecting the best interests of the children. The father, on the other hand, points to several developments which, he asserts, constitute such a change. These include the mother's use of objects with which to spank the children, the removal of the children from the public school and the placement of them into an unaccredited institution, the increasing absence of the mother from the home, and the deteriorating hygiene of the children.

Citing our decision in *Von Tersch v. Von Tersch*, 235 Neb. 263, 455 N.W.2d 130 (1990), the mother urges that the removal of the children from the public school and the enrollment of them in the academy cannot be considered a material change of circumstances.

In *Von Tersch*, we were asked to determine whether the district court abused its discretion by ordering the Von Tersch children to attend public school rather than the private school which the custodial parent desired they attend. We held that

> a custodial parent in a marital dissolution proceeding may determine the nature or extent of the education for a child legally affected by the dissolution proceeding unless there

is an affirmative showing that the custodial parent's decision has injured or harmed, or will jeopardize, the child's safety, well-being, or health, whether physical or mental.

*Id*. at 272, 455 N.W.2d at 136. The *Von Tersch* noncustodial parent argued, as does the father here, that the children's attendance at the private school would reduce their opportunity for social interaction and that the public school, with its numerous extracurricular activities, science laboratories, sports facilities, and computers would provide greater opportunities than the custodial parent's chosen private school. In *Von Tersch*, we declined to evaluate the relative educational merits of the schools and found that the evidence did not establish that the school chosen by the custodial parent had or would have a detrimental effect on the children's safety, well-being, or health.

*Von Tersch* involved a noncustodial parent attempting to control his children's education without taking on the responsibilities of custody. Here, we are faced with a noncustodial parent who seeks custody in part because he wishes to exercise control over his children's education. The question thus is whether this difference has any legal significance.

Before a court may modify a dissolution decree so as to affect custody of minor children, the party seeking the modification must show that there has been a material change of circumstances which adversely affects the best interests of the children. *Schulze v. Schulze*, 238 Neb. 81, 469 N.W.2d 139 (1991). In the context of marital dissolutions, a material change in circumstances means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently. *McDougall v. McDougall*, 236 Neb. 873, 464 N.W.2d 189 (1991).

If the custodial parent has the right to determine the nature and extent of the education of the children in her or his custody, can such parent's decision to change the nature or extent of a child's education be considered a material change of circumstances sufficient to modify custody, absent an affirmative showing of a detrimental effect upon the child's

safety, well-being, or health? In other words, is the burden on the noncustodial parent less when that parent seeks to gain custody than when she or he wishes to control the child's education without taking on the responsibilities of custody?

Both *Von Tersch* and the case presently before us implicate the same constitutionally protected interests, and we are working under the same constraints. The rationale of *Von Tersch* which counsels against undue entanglement in the educational choices of the custodial parent is equally applicable to the present case, and the same constitutional limitations on a court's power apply. Therefore, the custodial parent's decision to change the nature or extent of minor children's schooling does not support a change in custody absent an affirmative showing by the party seeking the modification that the custodial parent's decision has injured or harmed, or will jeopardize, the child's physical or mental health, safety, or well-being.

While the record in this case raises concerns about the quality of education provided by the academy, it does not affirmatively show that the children's continued enrollment therein poses a danger to their safety. Therefore, the removal of the children from the public school and their placement in the academy is not, in and of itself, a sufficient basis for changing custody.

The same, however, cannot be said of the father's remaining concerns, that is, the mother's frequent recourse to excessive corporal punishment, her increasing absence from the children, and the children's deteriorating condition.

The mother asserts that her use of corporal punishment cannot constitute a change in circumstances because both parties spanked the children prior to the dissolution. However, the testimony indicates but one incident where a child was struck by the father with an object prior to the dissolution.

It is the severity of the punishment inflicted in relation to the transgression occasioning it that concerns us. Particularly troubling is the mother's failure to recognize the impropriety of her excessive "discipline," raising the very real concern that she will again resort to such abuse in the future.

The mother appears to spend little time with her children, and the burden and responsibility of caring for the other

children has fallen upon the 15-year-old daughter. Although the mother is absent from the children because of her job looking after Tucker and ought not, and cannot, be deprived of the custody of her children for trying to support them, it is the best interests of the children which is our paramount concern. See *LeDoux v. LeDoux*, 234 Neb. 479, 452 N.W.2d 1 (1990).

In agreeing to the academy's "Statement on Discipline," the mother appears to have given the academy carte blanche in using corporal punishment to discipline the children, giving it complete discretion on such use, accepting the staff's judgment in matters of discipline, and not supporting any criticism the children may have of the academy. Giving so much free rein to the staff of the academy and entrusting so much of the children's care to the 15-year-old daughter indicate at least a partial abdication of parental responsibility. This is not to say that sending a child off to day care while the parent works is somehow a shirking of parental responsibilities; in these days of single parents struggling to support their families, such things are inevitable. Our concerns are, first, with the fact that so much of the caregiving responsibilities is falling upon the 15-year-old and, second, with the mother's unconditional agreement to accept whatever discipline decisions the staff of the academy might make.

The children's loss of weight and deteriorated hygiene and grooming are also legitimate sources of concern.

We can only conclude that had the dissolution court known that the mother would give one of her children over 40 lashings with a leather belt because of the child's attitude and her shortcomings as a copyist, subject another to near daily beatings, subject the younger children to the primary care of the 15-year-old, and permit a deterioration in their general condition, the original dissolution decree would not have given custody to the mother. These facts are more than sufficient to show a material change in circumstances adversely affecting the best interests of the minor children, and support a change in custody.

One last question remains concerning this summarized assignment of error: Does the fact that the mother justifies her use of corporal punishment by reference to her religious beliefs

affect our determination? When a parent's first amendment interests may be implicated in an action concerning the custody or visitation of her or his children, the courts will not impinge upon those interests absent an immediate and substantial threat to the temporal well-being of the children. *LeDoux v. LeDoux, supra.*

Clearly, the mother's excessive use of corporal punishment poses an immediate and substantial threat to the temporal well-being of her children; thus, even if the mother's first amendment rights are implicated, the facts nonetheless support a change of custody. Because of this determination, we need not reach the mother's claim that the district court erred in finding that her religious beliefs have caused a deficiency or incapacity which prevents her from performing reasonable parental duties. It is, however, appropriate to recall that although "the prohibition against infringement of religious belief is absolute, the immunity afforded religious practices by the first amendment is not so rigid." *LeDoux v. LeDoux, supra* at 485, 452 N.W.2d at 5. Insofar as the district court found that the mother's religious beliefs, rather than her particular practices, created a deficiency or incapacity in her ability to perform reasonable parental obligations, the district court abused its discretion.

In the second and last of her summarized assignments of error, the mother challenges the district court's order directing her to refrain from the use of corporal punishment and fear as a means to force the children's obedience to the doctrines of her religion, and to abstain from discussing her religion with them.

In its decree of modification, the district court made the following findings and comments:

> Since the entry of the decree herein, the [mother] has adopted systems of corporal punishment and fear to force obedience and submission of her children to the doctrine of her church.

> Generally, Courts preserve an attitude of impartiality between religions and will not disqualify a parent because of his or her religious beliefs. However, when such beliefs threaten the health and wellbeing [sic] of children, then the courts have a duty to act to remove children from such

abuse.

. . . .

If she were allowed to continue her practice of corporal punishment and fear onto these children, it is obvious that such acts would have not only a deleterious affect [sic] upon the relationships between the [father] and the children, but also upon the physical and mental wellbeing [sic] of the children themselves.

The district court's concerns in this matter were clarified at the hearing on the mother's motion for new trial, during which the court made the following observations:

And, I agree with you, when you say, that that's a fundamental right that people have with regard to schooling their children in religion. But, when that schooling or that indoctrination or that kind of commentary installs or instills fear in these children, then I don't think that is a constitutionally protected parental right.

And, at some point in time, the courts have the duty to step in, as I said, in this case here. No — No right is absolute. And, I don't believe that the First Amendment guarantees to any of us, the right to step in and create fear in another human being. It seems to me that's what this evidence indicated that [the mother] was doing by her threats and her comments to these children with regard to their salvation of their souls, if you will.

I detected a — a real fear on the part of these children as they testified. And it seems to me that we have no constitutional right to install [sic] that kind of fear, whether it be under the guise of religion or under the guise of torture or anything else, in any child. And so, that's why I said what I did in the opinion and I don't think that it does violate any fundamental due process right. Because the right to expression and freedom of religion, I don't think, is that absolute, nor is it that broad.

The mother argues that the evidence does not support the district court's finding that her use of "corporal punishment and fear" was for the purpose of "forc[ing] obedience and submission of her children to the doctrine of her church."

Because we have determined that the evidence supports a change in custody, the challenged finding is relevant only so far as it supports that part of the district court's order forbidding the mother "from making any comments to the minor children with regard to her religious beliefs, whatsoever, under the penalties of contempt."

> Courts have a duty to consider whether religious beliefs threaten the health and well-being of a child. [Citations omitted.] Thus, when a court finds that particular religious practices pose an immediate and substantial threat to a child's temporal well-being, a court may fashion an order aimed at protecting the child from that threat. [Citations omitted.] In so doing, a court must narrowly tailor its order so as to result in the least possible intrusion upon the constitutionally protected interests of the parent.

*LeDoux v. LeDoux*, 234 Neb. 479, 485-86, 452 N.W.2d 1, 5 (1990).

Our first inquiry, therefore, is whether there are particular religious practices of the mother which pose an immediate and substantial threat to the children's well-being. In *LeDoux*, we held that the district court did not abuse its discretion when it ordered a noncustodial parent not to " 'expose or permit himself or any other person to expose the minor children of the parties to any religious practices or teachings that are inconsistent with the religious teachings espoused by the [custodial parent] . . . .' " *Id.* at 485, 452 N.W.2d at 4. We found that there was ample evidence that one of the minor children was experiencing serious stress which posed an immediate and substantial threat to his well-being and that this stress was due in part to the child's involuntary exposure to the disparate religions of his parents.

The testimony in the case before us is that the children were afraid that the father and other relatives were consigned to perdition and that the father follows the devil, or has the devil in him or living in his house. At least one of the children is afraid to even enter the father's church because she has been taught that it is a daughter of "the great whore." Clearly, the father's abilities to perform his duties as a custodial parent and to

provide for his children's religious training will be undermined, with corresponding harm to the children, if the mother is permitted to foster and maintain such fears in the children. They can be expected to become insecure and malfunctioning adults who lack confidence in themselves.

There was also testimony that the father feels that certain behavior and activities apparently forbidden or discouraged by the mother's church are appropriate for his children. These include permitting the children to watch television, participate in school sports, and dress in a contemporary manner. While these may seem minor concerns, there was testimony that the conflicting messages the children were receiving from their parents regarding what constitutes appropriate or sinful behavior was causing great distress and confusion for the children. Indeed, Cassie was convinced that she was evil and doomed to everlasting damnation because she cut her hair and wore pants and earrings after moving back with her father.

Equally important are the observations of the trial judge, who witnessed the testimony of the two elder children and watched their interaction with the mother as she examined them. The trial judge felt compelled to remark on the degree of fear he saw in these children. This is a thing which we cannot fully appreciate from our review of the cold record; however, the following description given by the clinical social worker is illuminating:

Q What, if anything, did you observe from Cassie's behavior on the stand last Friday?

A Cassie — Cassie's anxiety to me was very apparent. She rung [sic] her hands, she cried, she took her scarf on and off. And then when she started — when the pressure became more and more difficulty [sic] about her belief system and in what — I mean it was the essence of what she's struggling with. She is really trying to decide whether or not she's evil. Whether or not that she's following Satan instead of God. And when that became more and more pointed in — and [the mother] started asking her more and more questions about, you know, shouldn't children be frightened, shouldn't children be scared of going to hell, she put her scarf that she had on over her face and to

me it was a very poignant and very concrete way that I think that she dealt with life as a whole. If it got too tough, if the questions got too difficult, you just cover up. And so she did that. She put the scarf all over her face and you couldn't see her, she wiped her tears away and then put it down and put it back up again and I think that's kind of what she's done emotionally. You put the scarf over all of you. And you don't let much in and you don't let much out and then you can kind of go. And I think that her pain was — was evident.

The mother apparently concedes the validity of the district court's concerns regarding her use of corporal punishment and her comments concerning the moral worth of those who are not members of her congregation, stating: "Such corporal punishment and such direct comments about persons who were not members of the church, can be considered as harmful to the children." Brief for appellant at 14.

In light of the foregoing, it was not an abuse of discretion for the district court to impose reasonable restrictions on the mother's religious discussions with the minor children. However, the restriction that she abstain from making any comments to the children with regard to her religious beliefs is broader than is presently needed to protect the children. We thus modify that portion of the district court's decree to provide that the mother abstain from making any comment to the children which in any way contradicts, disparages, or questions the validity of the father's religion or of those with whom he or the children associate, or which in any way interferes with the children's relationship with the father.

We thus turn our attention to the father's cross-appeal— which claims that the district court abused its discretion by failing to require the mother to pay child support— commenting that in view of the mother's failure to file a brief in response to his cross-appeal, his suggested total amount of $140 per month for the three children is reasonable.

Neb. Rev. Stat. § 42-364.16 (Reissue 1988) reads:

The Supreme Court shall provide by court rule, as a rebuttable presumption, guidelines for the establishment of all child support obligations. Child support shall be

established in accordance with such guidelines unless the court finds that one or both parties have produced sufficient evidence to rebut the presumption that the application of the guidelines will result in a fair and equitable child support order.

*Knippelmier v. Knippelmier*, 238 Neb. 428, 470 N.W.2d 798 (1991), advises that as a general matter, child support payments should be set according to the Nebraska Child Support Guidelines (rev. 1991) established by this court.

The guidelines compute the presumptive share of each parent's child support obligation on the basis of the "[t]otal [m]onthly [i]ncome," which is defined as the "income of both [parents] derived from all sources," except for that derived from certain designated sources not involved in this case, less, so far as relevant to our inquiry, tax and Social Security insurance payments.

Thus computed, the mother's annual income is $6,032.50 and the father's $18,593, making the total monthly income $2,052.13. The guidelines provide that out of such a total monthly income, $759 per month be allocated to the support of the parties' three children, of which sum the mother is to presumptively contribute 24.5 percent, or $185.96, and the father 75.5 percent, or $573.05. However, inasmuch as the father has asked that the mother contribute but $140 per month, we direct that the mother be required to pay the father the sum of $46.67 per month per child for the use and benefit of the parties' children.

We therefore affirm the decree of the district court as modified by this opinion.

AFFIRMED AS MODIFIED.