IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

SCHROEDER V. SCHROEDER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

CLAYTON B. SCHROEDER, APPELLEE,

V.

MARIA A. SCHROEDER, NOW KNOWN AS MARIA A. MICHAELIS, APPELLANT.

Filed April 11, 2017.    No. A-16-067.

Appeal from the District Court for Douglas County: PETER C. BATAILLON, Judge. Affirmed.

Benjamin E. Maxell, of Katskee, Suing & Maxell, P.C., L.L.O., for appellant.

Matthew Stuart Higgins and, on brief, Brandie M. Fowler, of Higgins Law, for appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

INTRODUCTION

Maria A. Schroeder, now known as Maria A. Michaelis (Michaelis), and Clayton B. Schroeder (Schroeder) were divorced in June 2006; they share custody of their daughter. These parents have returned to the district court for Douglas County numerous times for the purpose of modifying their divorce decree or to allege violations of the decree by the other party. The present matter arises from both parties' attempt to modify their custody arrangement. Relevant to this appeal, the district court left in place their joint legal and physical custody arrangement, but with the modification that Schroeder would have final decisionmaking authority if the parties could not agree on matters, such as participation in sports and other activities. Michaelis appeals that portion of the order. We affirm.

- 1 -

BACKGROUND

Since their last modification in January 2013, Schroeder and Michaelis have had equal parenting time with their daughter, Lexi, who was 11 years old at the time the present matter went to trial in August and October 2015. The evidence from trial revealed the following.

Schroeder has parenting time every Monday and Tuesday; Michaelis has parenting time every Wednesday and Thursday. The parties alternate the weekends. Both Schroeder and Michaelis are physicians, and both have remarried and have children with their current spouses. Over the many years since their divorce, the parties have been unwilling to set aside their personal grievances with one another for the sake of their daughter. Schroeder will not make eye contact with Michaelis, even when Lexi is present, and responds to Michaelis' questions in as few words as possible. Michaelis sees this as disrespectful and an attempt to undermine her relationship with Lexi.

On the other hand, Michaelis has enrolled Lexi in a number of different sports, and the practices and games for the various sports often occur during Schroeder's parenting time, and he resents this. As a result, Schroeder has not taken Lexi to practices or games, and in fact, he has attended only one softball game out of 40 in the year preceding trial, and a couple basketball games in the two years preceding trial. And while Michaelis saw Lexi being part of a team as a way for her to meet friends and get physical activity, Schroeder had a different attitude. When asked if he thought watching his daughter's athletic events was good family time, Schroeder answered, "Do I think it's good family time to watch my daughter kick dirt on a field and get to bat two times over three hours? No, I think that's a bad use of family time." Schroeder's opinion was that Lexi could be in one major sport per year, and then she could rotate year to year so that she would not be focused on one sport. Schroeder's idea for Lexi's involvement with sports was, "One year try volleyball, the next year try basketball, the next year try softball. That's what we're doing for our other children in our house." Michaelis perceived Schroeder as undermining her parenting by not taking Lexi to activities, and by not communicating with her (Michaelis). Michaelis would offer to pick Lexi up for her games and bring her home when it was Schroeder's parenting time, but Schroeder would simply respond, "We have plans." Lexi missed a number of practices and games when in Schroeder's care. Michaelis felt that Lexi's "sporadic participation" is "a headache for everyone, but especially Lexi. I feel like she gets stressed because she wants to be a member of the team . . . and then she feels like she's letting down her teammates. She's not able to get into the swing of things with her team."

Michaelis agreed that "the whole reason we're here today" is that she believes "in a certain set of activities and a certain set of ways to raise a child," and Schroeder "believes in a certain set of activities and a certain way to raise a child." Michaelis also believed "in including [Schroeder] in knowing about what his daughter's doing" and he does not do the same. Besides the disagreements regarding Lexi's involvement in sports, and in addition to a church confirmation issue which was resolved by the end of trial, Michaelis and Schroeder were unable to agree on where Lexis should go for high school. Michaelis wants her to go to Elkhorn, Schroeder wants her to go to a parochial school.

From Michaelis' perspective, Schroeder "[j]ust makes everything harder than it needs to be." Michaelis felt it was necessary for Schroeder to communicate with her about Lexi's schooling and extracurricular activities. And apparently to minimize the tensions between Michaelis and Schroeder regarding telephone time while Lexi is in Schroeder's care, Michaelis purchased a cellular phone for Lexi on her 11th birthday. After Lexi took the phone to Schroeder's house, Michaelis received an email from Schroeder saying he was not going to allow Lexi to have the phone at his house.

As to what material circumstances had occurred since January 2013 when the parties had last modified their decree, Michaelis said that "[e]mails and phone calls have gotten worse." She claimed Schroeder seldom answered her voice mails, "maybe 1 out of 10, or 1 out of 20, and he doesn't ever pick up the phone when I call." In addition to the communication being "less and less," Michaelis also stated that

> [t]he interactions have been more negative on [Schroeder's] behalf. I don't get responses about important things that are coming up in Lexi's life such as communication [about] her middle school and high school. Choices that we need to be making together . . . She's getting older. She needs to be in more activities and she's going to be in more activities and there's going to be more decisions to be made and I need to be the one that makes those.

Michaelis testified that Lexi would not be able to participate in sports much longer "because she's getting to that age where she can't miss half and be part of these teams." She would only be able to participate in activities where sporadic attendance was acceptable, such as swimming lessons, or other lessons here and there. Michaelis stated, "[Lexi] won't be a part of athletics, which is hugely important in my opinion."

Michaelis had a number of witnesses testify on her behalf. Lexi's former fifth grade teacher talked about Lexi being "a very good student," and he discussed Michaelis being "very involved" at the school, helping two to three times per month in his classroom. The children's ministry and education coordinator from Michaelis' church spoke about knowing Lexi since she was a baby; she also talked about how Michaelis volunteered as a Sunday school teacher. The coordinator observed the Michaelises to be a happy family. Another witness, the mother of one of Lexi's friends, said she knew Michaelis through the elementary school and Girl Scouts, and that Michaelis and Lexi "have a positive relationship that's loving."

Michaelis' final witness, an owner and director of a volleyball academy, talked about the various program options offered at her business, and how Lexi started in one of their programs in the fall of 2011 when Lexi was in second grade. The owner said Lexi seems to enjoy volleyball and she gets involved, and "she's got a smile on her face, she's always trying to get better, she's always very receptive to information, very coachable." The owner said the first league Lexi entered, she missed practices 60 to 70 percent of the time, and would "have to kind of catch up and find out what was going on[.]" The owner knew Lexi was not there because she was at her father's; Lexi would tell her this. The owner had 36 years of volleyball background, including coaching high school and college volleyball. She has coached a couple thousand players during that time, ages kindergarten to 18. Girls can eventually advance to club or select teams; "the trend

right now is right around fourth or fifth grade year they start looking." The owner observed Lexi to not "seem as excited or happy" when she first arrives after not being there for a week and "she feels like she's behind and she's catching up. Once she feels she's caught up, her mood changes." Finally, the owner opined, "I think volleyball right now is a very important part of what [Lexi] does and who she is and what she wants to be . . . and when I see her walk in the door and she's happy and she enjoys being there and she wants to be social and friendly I think volleyball for her right now is important."

Schroeder testified that Michaelis calls "most every night that Lexi's in my possession." With regard to Lexi's various athletic activities, Schroeder stated, "For the last three years, I've gotten the schedule of games and practices after Lexi is signed up and enrolled and she's been meeting with the team already." Schroeder did not appreciate that he was not included in the planning to see if he had time available "[b]ecause we have a pretty significant fall schedule ourselves." At the end of the first semester of Lexi's fifth grade year, Schroeder unenrolled Lexi from some dance classes because Lexi was not doing well at school. "[A]t the same time [Michaelis] enrolled her in basketball." Schroeder took extra time to help Lexi with homework and by the end of fifth grade, Lexi did really well, but Schroeder said this "was because we took the time at our house to get the homework done." Schroeder enrolled Lexi in dance and piano lessons, but those always took place on his parenting days.

As noted earlier, Schroeder and Michaelis had different viewpoints about Lexi's involvement in sports at her age. According to Schroeder, "I feel as long as a kid is a kid they get to interact with their family, and being sent to a coach or an extracurricular activity at that time can be done at a later age - state in life, but when you're a kid you get to play with your cousins and see your grandma and grandpa." Lexi is doing an independent 4-H program, but that is during Schroeder's parenting time. Schroeder said, "I don't impose anything outside of the time that is the weekend that we have Lexi." Schroeder is not opposed to sports but "three or more hours per week for practice and then week[ly] games for 10 and 12 weeks per season is excessive and it interferes with the time that you get to be a kid and the time you get to be with your family."

As for not responding to Michaelis' messages, Schroeder testified that if Michaelis does not get the response she wants, she will send the same request again. Schroeder says, "It's like having a child that says, are we there yet, and it's always the same question."

Schroeder testified that there is no disagreement between Michaelis and him regarding Lexi's doctor or issues at school or with the church. He stated, "We have good communication about the important parts of Lexi's life . . . her school, her church, and her health. . . . We're able to communicate effectively about those issues." However, they cannot agree about where she needs to go for high school. Schroeder testified that he wants to send Lexi to a Catholic or Christian school because "the education that they get and the parental involvement that is achieved through that type of education is significantly better than a Class A [Omaha Public Schools] school." Schroeder said he was willing to pay the costs.

After two days of trial (August 19 and October 15, 2015), the parties and their attorneys appeared in court on October 29. At that time, the court verbally set forth its findings and decision on the record. The court stated, in part:

Your case has provided me an awful lot of consternation. I tried to help rectify your situation last year by having the two of you have breakfast together so at least your daughter would be able to see that her parents whom she loves the most are able to communicate. That didn't work out.

I wish I could get into your minds to instill in you the necessity of the two of you getting along and having reasonable and appropriate verbal conversations so that your daughter could see the two people she loves the most get along. And I don't know how to do that.

. . . .

[I]t's very important I think for children to be involved in sporting activities or activities that are similar to that . . . they provide understanding of commitment to the kids. There's teamwork. There is effort that you have to expend to be on the team. There's preparation . . . There is the resiliency, understanding, accepting defeat, learning how to accept victory. There is the anxiety of being under pressure . . . .

But in all respects, sports is not an end to itself.

. . . I'm not changing the possession schedule. I think that your daughter needs both of you in her life . . . But the problem is . . . the two of you can't get along on certain matters. Some things you do get along reasonably well, others you don't. And there is [sic] now problems with sporting events and there's also a problem with the high school. I believe, and I'm finding, that the two of you have resolved the issue as to Confirmation which will be in [Michaelis'] church.

So the Court finds that there's been a material change in circumstances as to certain matters regarding this and I'll go to the minor things first.

The court then addressed healthcare expenses; each party was to pay equally, and cooperate in using healthcare savings accounts, but if they cannot, they have to reimburse the other party "and that's just how it is." Each party was directed to pay their own attorney fees. As to telephone calls, the "possessory parent" or Lexi shall initiate the phone call each day at the appropriate time the parties have agreed upon.

As for sporting events and final decisionmaking authority, the court held as follows.

[I]n order for there to be sporting events the parties have to agree as to that event. One party cannot unilaterally enroll their daughter in these sporting events that's going to affect the other party. If the event doesn't affect the other party . . . then there really isn't a problem there. Although, both parties should be consulted as to what the daughter is doing.

So I'm going to continue the joint physical and legal custody, however, as to the final decision-making, and that's the problem in this case, I am granting that final decision-making to [Schroeder]. And these are the reasons. I mean, I have spent innumerous time considering what's in the best interest of the child, who gets along, and things of that nature. One of my fallback tools . . . is which parent will be more likely to respect the rights of the other party.

And whether I'm right, wrong, or indifferent, [Michaelis], I decided it was [Schroeder]. The reason - one of the reasons I decided that is that he is respecting your time

by how he comports his time with his daughter. You don't do that. You have your daughter involved in all these sporting activities, which is fine, but they affect him and you don't consult him when you do that.

. . . .

[Schroeder], I mean you have problems with your communication with [Michaelis]. And I understand why you may have a problem with communication. [Michaelis], to be frank, you come off a little strong, but you come off a little strong because of your passion for your daughter. . . I could be getting this wrong, but, [Schroeder], you seem a little bit more calm about your approach to things. That can be good and that can be bad. But you're both unbelievably committed to the child, except, as to . . . probably the most important component of the child and that is love. For the love, you provide the child love, but one of the most important aspects of the love your child needs is what you all learn in Christianity, and that's to love one another, and the two of you aren't doing that with each other. And that is the most important component that your child needs to have. And I don't know how to get into your psyches to get you to do that.

So what that means is, is that the parties have to discuss with each other the activities of the child, the parties have to agree on those activities that are going to affect . . . both parties. If they can't agree on that, then, [Schroeder], you get to make the final decision. And I would expect that you would be rational and that you would be respectful of [Michaelis] as to her desires and what's important for the child.

There's going to be disagreements and disagreements are part of life and are appropriate for life. But they have to be based upon rationale [sic] and not inappropriate reasons.

. . . I'm not going to order, as the suggestion was made by [Schroeder], that she be involved in one sport one year, one sport the next year . . . I don't think that would be appropriate. . . . [Y]our daughter has to be involved in things that she wants to be involved in in a reasonable regard.

What I would expect, [Schroeder], is, is that you and [Michaelis] decide on an appropriate sport or sports, but then you have to be committed to that also to take her to those sports events when you have her, too. . . . [Michaelis] is absolutely right. If your daughter's on a team and she only shows up half the time, you are really putting your daughter in a tough situation because she has to face her teammates. Where were you? How come you weren't here? But because that's what sports are, is a commitment.

Anyway, right, wrong or indifferent, that is how I have decided this case. And I would hope that the two of you are able to negotiate better regarding these things and negotiate what's in the best interest of Lexi.

. . . .

But somebody has to have the final say, and that final say as to sports, high school, those things, I'm placing that with [Schroeder] because I believe - and I'm splitting hairs, but I believe that he will be able to best respect the parental rights of . . . [Michaelis].

Michaelis timely appealed the October 29, 2015, findings set forth above and the order entered December 22, memorializing those findings.

## ASSIGNMENT OF ERROR

Michaelis' brief fails to set forth a specific section assigning errors, however, an argument heading asserts that the district court erred in not awarding Michaelis sole legal and physical custody. The absence of an assignments of error section is addressed below.

## STANDARD OF REVIEW

Generally, issues involving the modification of a divorce decree, child visitation, and the amount of child support are initially entrusted to the discretion of the district court, whose decisions are to be reviewed on appeal de novo on the record and will be affirmed absent an abuse of discretion. *Groseth v. Groseth*, 257 Neb. 525, 600 N.W.2d 159 (1999).

An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or it its action is clearly against justice or conscience, reason, and the evidence. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *Id*.

Where credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Sullivan v. Sullivan*, 249 Neb. 573, 544 N.W.2d 354 (1996).

## ANALYSIS

*Failure to Include Assignments of Error Section.*

We first address the absence of an assignments of error section in Michaelis' brief. Nebraska Court Rules of Appellate Practice require that briefs filed by appellants contain an assignments of error section. Section 2-109(D)(1)(d), (e), and (f) requires a separate section for assignments of error, designated as such by a heading, and also requires that the section be located after a statement of the case and before a list of controlling propositions of law. *Steffy v. Steffy*, 287 Neb. 529, 843 N.W.2d 655 (2014). The Nebraska Supreme Court has repeatedly held that assignments of error consisting of headings or subparts of the argument section do not comply with the mandate of § 2-109(D)(1)(e). *Id*. Where a party fails to comply with the court rules requiring a separate section setting forth the assignments of error, an appellate court may proceed as though the party failed to file a brief entirely, or alternatively, may examine the proceedings for plain error. *Wilson v. Wilson*, 23 Neb. App. 63, 867 N.W.2d 651 (2015). The decision to proceed on plain error is at the discretion of the appellate court. *Id*. Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *Id*.

Schroeder argues that no plain error is evident from the record and asks this court to dismiss the appeal. We decline to do so. Further, as discussed next, whether we review the record before

us on a de novo for an abuse of discretion standard of review, or whether we review it for plain error, the result is the same.

*December 22, 2015, Order of Modification.*

Before a court may modify a dissolution decree so as to affect custody of minor children, the party seeking the modification must show that there has been a material change of circumstances which adversely affects the best interests of the children. *Peterson v. Peterson*, 239 Neb. 113, 474 N.W.2d 862 (1991). In the context of marital dissolutions, a material change in circumstances means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently. *Id.* The burden is upon the party seeking the modification to show that there has been a material change of circumstances. *Sullivan v. Sullivan*, 249 Neb. 573, 544 N.W.2d 354 (1996).

The parties last modified their decree by a stipulated order entered in January 2013. Since that time they have shared joint legal and physical custody, which included the equal sharing of parenting time as previously described.

Michaelis' complaint to modify is not in our record, but at trial she testified that she was seeking to reduce Schroeder's parenting time to one night per week (rather than two) and alternating weekends, so she was seeking some adjustment to the parenting time schedule. It would also appear that she was seeking to eliminate the joint legal custody provision, in light of her testimony that she needs to be the one making decisions that would be coming up as Lexi gets older. Michaelis also testified, "I believe that by giving me the ability to make these decisions on Lexi's behalf it will diminish the amount of communication that we have to have. We can't communicate. We've proven that. We can't make that work. And so if we have less opportunity to communicate for less reasons because I'm making those decisions there would be less stress on my daughter." Michaelis' testimony suggests she was seeking sole legal custody. Schroeder's "Cross-Complaint for Modification" filed June 24, 2015, is in our record; it is clear he was seeking an award of sole legal custody, and he wanted to remove the provision for telephone time from the current parenting plan.

Michaelis argues that the district court "grossly erred" in awarding Schroeder final decisionmaking authority, and that this decision was "a travesty of justice[.]" Brief for appellant at 5. Michaelis says she is "by far the more logical, communicative and involved parent of Lexi." *Id.* Michaelis discusses Schroeder's lack of communication and his lack of involvement with Lexi's extracurricular activities. Michaelis also points out the witnesses who testified on her behalf as compared to Schroeder, who called no witnesses besides himself. Because Michaelis has made multiple attempts to co-parent and communicate with Schroeder for Lexi's sake, while Schroeder ignores or attempts to undermine Michaelis' parenting of Lexi, Michaelis says "it is virtually incomprehensible" that the district court awarded Schroeder legal custody. Acknowledging that the court maintained joint legal custody, Michaelis says that "it is obvious that Schroeder and Michaelis can rarely agree on anything." Brief for appellant at 10. Michaelis suggests that when she and Schroeder disagree in the future, "Schroeder will undoubtedly exercise his will regarding all matters; regardless if such decision is in the best interests of Lexi." *Id.*

Schroeder argues that "[t]he tenor of [Michaelis'] brief matches the tenor of her demeanor at the time of trial. Argumentative, cagey, unwilling to concede even the smallest points[.]" Brief for appellee at 11.

Courts typically do not award joint legal custody when the parties are unable to communicate effectively. See *Kamal v. Imroz*, 277 Neb. 116, 759 N.W.2d 914 (2009) (joint decisionmaking by parents not in child's best interests when parents are unable to communicate face-to-face and there is level of distrust); *Klimek v. Klimek*, 18 Neb. App. 82, 775 N.W.2d 444 (2009) (no abuse of discretion by district court's failure to award joint custody when minor child was confused by temporary joint legal and physical custody arrangement and parents had hard time communicating with one another). However, a trial court's decision to award joint legal or physical custody can be made without parental agreement or consent so long as it is in the child's best interests. Neb. Rev. Stat. § 42-364(3) (Reissue 2016) states:

> Custody of a minor child may be placed with both parents on a joint legal custody or joint physical custody basis, or both, (a) when both parents agree to such an arrangement in the parenting plan and the court determines that such an arrangement is in the best interests of the child or (b) if the court specifically finds, after a hearing in open court, that joint physical custody or joint legal custody, or both, is in the best interests of the minor child regardless of any parental agreement or consent.

In *State on behalf of Maddox S. v. Matthew E.*, 23 Neb. App. 500, 873 N.W.2d 208 (2016), this court noted that appellate review of joint legal custody issues has often focused on the parties' ability to communicate, but we pointed out that appellate courts review such decisions for an abuse of discretion and may give weight to the fact that the trial judge heard and observed the witnesses. Further, "In affording such deference to the trial courts, appellate courts have in some instances declined to reverse trial court decisions where joint custody has been awarded or maintained even when the evidence demonstrates a lack of communication or cooperation between parents." *Id*. at 518, 873 at 219.

In *State on behalf of Maddox S. v. Matthew E.*, this court described two appellate cases in which communication or cooperation between parents was problematic, but joint legal custody was preserved, namely, *State on behalf of Jakai C. v. Tiffany M.*, 292 Neb. 68, 871 N.W.2d 230 (2015) (Supreme Court affirmed trial court's denial of father's request to modify joint legal custody to sole legal custody even though the evidence revealed the parents failed to appropriately communicate with regard to their child); and *Kay v. Ludwig*, 12 Neb. App. 868, 686 N.W.2d 619 (2004) (this court affirmed trial court's award of joint legal custody despite alleged harassing and menacing communication between parents, noting concern that giving sole custody to the mother might result in the mother not fostering the relationship between the father and their son). Also, recently, this court affirmed a joint custody order despite communication issues between the parents. See *State v. Anthony W.*, 24 Neb. App. 47, 879 N.W.2d 402 (2016) (district court's decision to award joint legal and physical custody affirmed despite mother's claim that father's communication has followed a pattern of power and control).

In *State on behalf of Maddox S. v. Matthew E.*, *supra*, which was another case involving repeated appearances in the courtroom by the parties, we gave deference to the district court's attempt to find a workable solution to protect the child's best interests. This court stated:

> Because of the power struggle between the parties, the district court was not willing to favor one parent over the other in allocating parental responsibilities or parenting time. Although still encouraging mutual decisionmaking, the court's specific division between the parties as to who has final say on the larger child-rearing decisions splits the parenting 'control' and will hopefully minimize conflict between the parties.

*Id*. at 520, 873 N.W.2d at 220.

In that case, the district court divided the legal custody responsibilities between the parents--the mother was the final decision maker for extracurricular and sporting activities, as well as for recurring or long-term medical, dental, and eye care needs; the father was the final decisionmaker with regard to the child's education and religious upbringing. This court observed, "Ultimately, by dividing responsibilities and designating which parent had the final say with regard to certain decisions, the court minimized the potential for conflict and the ongoing power struggle between the parties - something that is certainly in [the child's] best interests." *Id*. at 518, 873 N.W.2d at 219. We further pointed out that "[t]his division of final say allows both parties to assume a primary role in decisionmaking for [the child] and avoids favoring one parent over the other, or giving one parent all the control over the other, which the district court clearly sought to avoid." *Id*. Additionally, this division of legal responsibilities was consistent with the mutual authority and responsibility described in Neb. Rev. Stat. § 43-2922(11) (Cum. Supp. 2014) (definition of joint legal custody).

In the present case, rather than divide the final decisionmaking authority between the parents as the trial court did in *State on behalf of Maddox S. v. Matthew E.*, *supra,* the district court gave all final decisionmaking authority to Schroeder. However, by maintaining joint legal custody, the court retained the requirement that Schroeder must make reasonable efforts to involve Michaelis in decisions about activities and Lexi's future schooling. In other words, no decision can be made unilaterally by Schroeder without first making a reasonable effort to reach consensus with Michaelis. Although the history of conflict between these parents and the present record do not give rise to a lot of optimism that this latest arrangement will be successful, we cannot say the district court committed plain error or abused its discretion in concluding there had been a material change in circumstances warranting this modification to the parties' decree.

As we concluded in *State on behalf of Maddox S. v. Matthew E.*, *supra*, a material change in circumstances occurs when the parties still have ongoing conflict so many years past the entry of the original judgment. The district court in that case had stated, "it is 'not unusual that parents of a child involved in a divorce or paternity case' may have a 'rocky start,' but that 'typically, after a few months or a couple years, the parents figure out that they are not ending a relationship with the other parent, they are merely reconfiguring it,' and the 'parties fall into a pattern of conduct that works for them to raise their child free from interference or supervision by the courts.'" *Id*. at 514, 873 N.W.2d at 217. The parents in that case, as well as Michaelis and Schroeder in the present case, have "'been unable, and in some aspects unwilling to find that pattern.'" *Id*.

The district court in this case, much like the court in *State on behalf of Maddox S. v. Matthew E.*, *supra*, was presented with parents who clearly love their child, but who fail to see how their inability to get along and co-parent may be adversely impacting their daughter. The district court was genuinely concerned about Lexi's best interests. It also concerns this court that Lexi's voice may become lost in her parents' efforts to direct her life in what they each see as best for her, but which clearly places Lexi on divergent paths. At the time of trial, Lexi was only in the sixth grade, but her parents were already disagreeing on whether she would attend a public or parochial high school. Neither parent suggested that perhaps that was a decision that Lexi may want to weigh in on as she more closely approaches having to make that decision. The same goes for Lexi's extracurricular activities. While parental guidance in such matters for young children is important, Lexi must contend with a mother who has her enrolled in multiple sports (perhaps at Lexi's request or not, the record is not clear) and a father who sees playing softball as a "bad use of family time" to spend three hours watching Lexi "kick dirt on a field and get to bat two times." With regard to sports, for Lexi to please her mother (or perhaps herself), she will upset her father, and to please her father (or perhaps herself), she will upset her mother. The same goes for selecting a high school. Lexi by now knows she is in the middle of these divergent parenting philosophies. She can have a cellular phone with her mother, but not with her father. Lexi could not even get a flu shot without it becoming an issue between her parents. She could not move forward with her church confirmation without it being a problem between her parents. It is unfair to Lexi that ordinary or special life events must always be so contentious.

It is doubtful that the district court's decision to give Schroeder final decisionmaking authority will fix these problems, but it is apparent the district court was left with limited options. The court admitted, "I'm splitting hairs," but based on the court's consideration of the evidence, it determined Schroeder would respect the parental rights of Michaelis more than vice versa. In contested custody cases, the trial court's ability to hear and observe the witnesses is of great importance not only in making credibility determinations but also in making necessary findings as to the best interests and welfare of the children. *Davidson v. Davidson*, 254 Neb. 357, 576 N.W.2d 779 (1998).

Whether reviewing this record and decision for plain error (error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process) or for an abuse of discretion (decision of trial court is clearly against justice or conscience, reason, and the evidence), we cannot say the district court erred in leaving intact the parties' joint legal and physical custody of Lexi, with the modification that joint legal custody would now provide for Schroeder to have final decisionmaking authority.

CONCLUSION

The district court's December 22, 2015, order modifying the parties' decree is affirmed.

AFFIRMED.