Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/31/2017 09:20 AM CDT

Cecil Scott Schriner, appellee, v.
Sara Jane Schriner, appellant.
___ N.W.2d ___

Filed October 24, 2017.    No. A-16-890.

1. **Child Custody: Appeal and Error.** An appellate court reviews child
   custody determinations de novo on the record, but the trial court's deci-
   sion will normally be upheld absent an abuse of discretion.
2. **Judgments: Words and Phrases.** An abuse of discretion occurs when
   a trial court bases its decision upon reasons that are untenable or unrea-
   sonable or if its action is clearly against justice or conscience, reason,
   and evidence.
3. **Visitation: Appeal and Error.** Parenting time determinations are also
   matters initially entrusted to the discretion of the trial court, and
   although reviewed de novo on the record, the trial court's determination
   will normally be affirmed absent an abuse of discretion.
4. **Child Custody: Appeal and Error.** In child custody cases, where the
   credible evidence is in conflict on a material issue of fact, the appellate
   court considers, and may give weight to, the fact that the trial judge
   heard and observed the witnesses and accepted one version of the facts
   rather than another.
5. **Modification of Decree: Attorney Fees: Appeal and Error.** In an
   action for modification of a marital dissolution decree, the award of
   attorney fees is discretionary with the trial court, is reviewed de novo on
   the record, and will be affirmed in the absence of an abuse of discretion.
6. **Appeal and Error.** To be considered by an appellate court, an error
   must be both specifically assigned and specifically argued in the brief of
   the party asserting the error.
7. **Trial: Appeal and Error.** The conduct of final argument is within the
   discretion of the trial court, and a trial court's ruling regarding final
   argument will not be disturbed absent an abuse of discretion.
8. **Visitation.** The best interests of the children are the primary and para-
   mount considerations in determining and modifying parenting time.

 9. \_\_\_\_. The right of parenting time is subject to continuous review by the court, and a party may seek modification of a parenting time order on the grounds that there has been a material change in circumstances.

10. **Modification of Decree: Words and Phrases.** In the context of marital dissolutions, a material change in circumstances means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently.

11. **Modification of Decree: Proof.** The burden is upon the party seeking the modification of decree to show that there has been a material change of circumstances.

12. **Child Custody.** Pursuant to Neb. Rev. Stat. § 43-2929(1)(b)(ix) (Reissue 2016), the parenting plan shall include provisions for safety when a preponderance of the evidence establishes child abuse or neglect, domestic intimate partner abuse, unresolved parental conflict, or criminal activity which is directly harmful to a child.

13. **Attorney Fees.** Customarily, attorney fees are awarded only to prevailing parties or assessed against those who file frivolous suits.

14. \_\_\_\_. In awarding attorney fees, a court should consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services.

Appeal from the District Court for Franklin County: Stephen R. Illingworth, Judge. Affirmed.

Sara Jane Schriner, pro se.

Kristi L. Hilliard and Michael R. Snyder, of Snyder, Hilliard & Cochran, L.L.O., for appellee.

Moore, Chief Judge, and Pirtle and Bishop, Judges.

Bishop, Judge.

Sara Jane Schriner appeals from the decision of the district court for Franklin County reducing her parenting time, restricting her participation in routine health-related appointments of the parties' children, ordering her to attend an anger management course and counseling, and ordering her to pay $7,500 of her ex-husband's attorney fees. We affirm.

## BACKGROUND

Cecil Scott Schriner and Sara were married in 2005. Two children were born during their marriage—one son in 2007 and another son in 2009. Sara also had two teenage children from a prior relationship.

In February 2014, the district court entered a decree dissolving the parties' marriage. The decree indicates that during the marriage, the parties had resided on a farm, and that Cecil was a grain farmer and Sara had worked in the U.S. postal system but resigned in November 2009 to be a "stay at home mother." The district court awarded Cecil legal and physical custody of the parties' two children, subject to Sara's parenting time every Tuesday and Thursday evening (after school until 7:30 p.m.) and on alternating weekends (Friday after school until 5:30 p.m. on Sunday). Sara was also to get 6 consecutive weeks of parenting time every summer, during which Cecil would get parenting time on alternating weekends. Sara was ordered to pay child support in the amount of $617 per month. Sara appealed, and in an unpublished memorandum opinion, this court affirmed the district court's decision regarding custody, but reversed and remanded the child support determination for further proceedings. See *Schriner v. Schriner*, 22 Neb. App. xxv (No. A-14-371, May 22, 2015). Our mandate issued on October 29, 2015. On November 23, the district court's order on mandate was filed and ordered that Sara pay child support in the amount of $321 per month, beginning on February 1, 2014. There were further pleadings, orders, and two more appeals regarding child support (both dismissed for lack of jurisdiction) that need not be discussed here as they are not relevant to the current appeal.

On December 3, 2014, prior to the custody portion of the decree being affirmed on appeal, Sara filed a complaint for modification of parenting time. She alleged that since the entry of the decree in February, there had been a material and substantial change in circumstances justifying a modification of parenting time, specifically: Cecil applied to and was accepted

by the "LEAD 34 program," a 2-year program "operated by a non-profit Nebraska Agricultural Leadership Council" in cooperation with other "institutions of higher learning throughout Nebraska"; the program began in September and included "extensive time away from home"; Cecil refused to allow Sara the right of first refusal for parenting time during his participation in the LEAD program; Cecil refused to notify Sara in advance of the children's medical and other appointments in such a manner that she could attend the appointments; Cecil continually refused to have any discussions regarding the health of the children; Cecil refused to notify Sara of the children's activities in such a manner that would allow her to attend the activities; Cecil refused to provide Sara with information regarding the preschool that the younger child attended; and Cecil refused to provide the names and contact information for the children's daycares, daycare providers, or nannies. Sara asked the court to enter an order modifying her parenting time, ordering Cecil to notify her of all of the children's appointments and activities, ordering Cecil to provide names and contact information for all childcare providers, and awarding attorney fees and costs to her.

On January 26, 2015, Cecil filed an answer and "Cross-Complaint." In his answer, he alleged that Sara's complaint was frivolous and that she is able to pay his attorney fees for a frivolous action and should be ordered to pay his fees and court costs. In his "Cross-Complaint," Cecil alleged that since the entry of the divorce decree, there had been a material change in circumstances that justified a modification of the parenting time. He alleged that Sara had (1) engaged in a pattern of taking out her anger at Cecil in front of their children; (2) engaged in a course of action where she willfully and intentionally "poison[ed] the mind[s]" of their children; (3) made false accusations about Cecil to and in front of their children in an attempt to make them angry or prejudice them against Cecil; (4) engaged in disruptive behavior in front of their children at parenting time exchanges, medical

appointments, public outings, and other events; (5) engaged in behaviors wherein she set Cecil up for failure, embarrassment, or frustration in front of their children or others; and (6) failed and refused to cooperate with parenting time adjustments and used the frequency of the exchanges to send "harassing and annoying" text messages to Cecil. Cecil asked the court to modify the parenting time schedule to "a standard every other weekend schedule or another similar schedule." He also asked the court to enter additional orders "regarding behavior parameters and guidelines that should be met by the parties when co-parenting [the] children including notification procedures, and contempt procedures for behaviors that tend to or attempt to poison the minds of the minor children." In his amended "Cross-Complaint" filed on June 22, Cecil also alleged that a material change in circumstances had occurred, because Sara was picking the children up from school without his knowledge or consent and because she refused to allow the children to participate in activities during her parenting time. He also requested that the district court restrict Sara's participation in the children's medical care and extracurricular activities.

Trial on both parties' complaints to modify parenting time was held on March 9 and May 4, 2016. Sara appeared pro se, and Cecil was represented by counsel.

Cecil testified that he has had temporary custody of the boys since May 2011 (when they were 2 and 4 years old) and that he was granted full custody in January 2014. At the time of the divorce, Cecil proposed a parenting plan allowing for Tuesday and Thursday midweek parenting time because a presenter at his required "divorce class" "suggested heavily that children under the age of kindergarten never go more than three days without seeing their other parent." By the time of the modification hearing, the boys were 7 and 8 years of age. Cecil and Sara have mediated twice since the decree, but the parties have had ongoing conflict. Both parties testified regarding their struggles.

Sara testified that in July 2014, Cecil was given the opportunity to go back to school when he was accepted to the LEAD program. From July to December, Sara requested the dates of the program and asked to have the boys on those days, but Cecil refused. Cecil also refused to tell Sara who was watching the boys during that time. Sara said that from September 2014 to March 2016, there were "over 45 nights" that Cecil was at LEAD program seminars, but Sara had the boys less than half of those nights. "So, the main reason for me filing for more time with the boys was because [Cecil] was not going to be in the state, country or around the area, and it would have been a great opportunity to allow me to have that time."

Cecil testified that the LEAD program began in August or September of 2014 and lasted until March 2016. It was basically seminars, most of them lasting 3 days from Sunday to Tuesday, and then there were two 2-week seminars. He had given Sara more than 20 extra overnight parenting times when he attended the LEAD seminars, but he said she still "demand[ed]" more time; she never wanted to "trade weekends," and she only wanted extra weekends. Over the past 2 years, Cecil had attempted to make a "reasonable trade" with Sara more than 20 times, for the LEAD program or at Christmastime, but she refused (even if he was trading 5 days for 1). Cecil did not tell Sara specifically where the boys would be each time he left town for the LEAD program, but "[t]hey're either with me or they're with my parents," and testified that Sara knows that. He also said he does not specifically tell her where the boys will be because she is "so harassing and burdensome." When Sara asked him to give examples of dates and times when she was "harassing and burdensome," Cecil responded, "I don't catalog and mark down on a calendar every time you followed me home or bothered my friends or family, stopped in unexpectedly or unannounced like you do."

Cecil testified that he does not want to allow Sara to have the "first right of daycare" and that he believes she wants the children anytime they are not under his direct supervision. He said Sara sends text messages "hammering me that it's wrong for me to send them to my parents or to my sister's for some play time when she wasn't notified first and that she should have them first and not somebody else." Cecil said that the boys need to be involved with their extended family and should be able to spend the night with their grandparents or cousins, and even with friends.

Cecil testified that on Tuesday and Thursday nights, Sara's parenting time was supposed to end at 7:30 p.m., but that she would keep the boys until 8:30 or 9 p.m. without his permission. And many times Sara would ask for extended time to attend her older children's events. Cecil said he gives Sara some extra time, but sometimes it is not long enough for them to stay until the end of the event; then the boys are mad at Cecil because "it's been imposed on them that it's my fault they [had] to leave early." When Cecil granted extended time on Tuesdays and Thursdays, it disrupted the boys' sleep schedule and not all of their homework got done.

Sara testified that on Tuesday and Thursday nights, she feeds the boys, they do homework, they play, and she gives them baths. She said that sometimes they attended ball games or wrestling practice and that they also spend time with Sara's older children. The boys' bedtime is 8 p.m., "[a]nd so sending them to Cecil's at 7:30 is — disrupts their bedtime. If I could just give them a bath, send them to bed, then we would be done." Sara also said:

I have four children. The Tuesdays and Thursday nights until 7:30 is disruptive to everybody's schedule. We don't know if we have award banquets those nights. We don't know if we have ball games those nights. I have missed a lot of ball games for [my two older children]. . . . I asked [Cecil] if I could take [the boys] to Minden[, Nebraska,] to [their half sister's] very last volleyball

game [in November 2015]. They were playing subdistricts. [Cecil] refused to allow me to take the boys to the last game, which meant I didn't get to stay at the last game either.

Cecil testified that Sara did go to the subdistrict high school volleyball game in Minden. He said he tried trading nights with Sara, but she apparently did not agree to a trade. So she brought the boys home to her house, Cecil picked them up at 8 p.m. instead of 7:30 p.m., and then Sara went back to the game. He acknowledged that he denied Sara's request that he pick the boys up at the high school, even if she reimbursed him for mileage. On cross-examination, Sara testified she missed "over half" of her daughter's volleyball games. But she was confronted with several dates where either she sent Cecil a text message to say they would be late getting back to his house because they were at volleyball or Cecil picked the boys up from the volleyball game. If Cecil agreed to pick the boys up from a home game at the school, Sara said it was a benefit to him (rather than an accommodation made for her) because the school is closer than her house where he would have picked the boys up. Later, she said that just because she was at a game does not mean that she stayed for the entire game because she would have left early to get the boys home. Sara said she also "asked [Cecil] if we could stay and watch [my older son's] first varsity [basketball] appearance [in December 2015]. [Cecil] refused. And so I missed [my son's] first basketball game." "[M]y older kids never know if I'm going to be there or if I'm not going to be there." "I have failed my older two children over and over because of [Cecil's] actions."

According to Sara, during parenting time exchanges, the boys have cried, bitten, lashed out, run, and hid. Cecil "has done everything possible to alienate me from the boys." Sara does not "speak badly" about Cecil and his family to the boys. "When the boys are with me, we spend our time . . . hanging out. We don't spend our time trying to get them to hate [Cecil]."

Cecil, however, testified that Sara is "pitting" the boys against him. Some of the problems stem from when Cecil tells Sara that the boys cannot stay late; she then tells the boys that they "can't go to a game because daddy won't let them." For the past 2 years, after having parenting time with Sara, the boys are sometimes upset with Cecil, and their behavior is "[v]ery disruptive and toxic." He said that when he picks the boys up from Sara's house, they will yell at him, tell him that they hate him, and slam the door in his face. Cecil testified that when the boys leave Sara's house on Tuesday and Thursday evenings, they are upset "[a]bout half the time."

Sara's various witnesses, including the principal and a "paraeducator" from the boys' school, testified that they have seen Sara and Cecil at various events and activities and witnessed no disruptive behavior by Sara. Sara called another witness who has children that go to school with Sara's older children. The witness observed parenting time exchanges between Cecil and Sara at various events and said that for the most part the exchanges were good, but there were a couple times when the boys did not want to go with Cecil when they were supposed to.

Cecil's brother-in-law testified that at a basketball game in December 2014, the boys were standing by Sara and one of the boys asked her for money to buy candy. Sara spoke loudly, "so everybody [could] hear," and said, "I don't have any money. Your daddy took it all."

Cecil wanted the court to remove Sara's midweek parenting time "to try and calm the chaos in the boys' lives." He said that they need structure. In response to Cecil's request to eliminate the Tuesday and Thursday exchanges, Sara said:

I have no problems with getting rid of the exchanges. Allow them to spend the nights. There is no reason that the boys cannot spend Tuesday and Thursday night with me, and I can get them to school the next day. . . . This would allow me to not have to choose between going to my older kids' events or staying with my boys for the

> [parenting] time. These last two years I've had to be split,
> and it's been chaos for both my older children and my
> younger children.

According to Cecil, in addition to fighting about exchanges, it is a fight if he tries to give Sara time, if he tries to trade her time, and any time he sends her a message regarding the doctor or the dentist. The constant turmoil between Cecil and Sara is "wearing" on the boys. "They get to struggle with who's right or wrong, what's a truth or a lie, who's telling the truth, who's lying." He is asking the court to "remove the exchanges so there's no fighting[,] [l]et's quit the Tuesday and Thursday mid-week [parenting times]. It removes the conflict of after school activities that are predominantly on Tuesday and Thursday evenings. And then Sara can put them on the bus Monday morning." (Sara would lose Tuesday and Thursday evenings every week, but would get an extra overnight of parenting time on Sunday on her scheduled weekends.)

Both Sara and Cecil testified about other difficulties they have had beyond the Tuesday and Thursday evening exchanges. Sara testified that in the summer of 2014, she asked Cecil for a schedule of the boys' activities so that she could attend, but he refused. She said Cecil would not tell her until the activity was over or would tell her at the last minute. Sara asked Cecil if on her Christmas parenting time, the boys could participate in the program at her church, and on his Christmas parenting time, the boys could participate in the program at his church, but he refused to bring the boys to the practices at Sara's church during his parenting time. (Both parents are Lutheran, but they go to different churches.) In May 2015, Cecil refused to switch Sundays so that the boys could attend their half brother's confirmation; Cecil said it was Sara who refused to switch weekends.

Sara testified that another reason she filed for modification was "because [Cecil] refuses to give me notification of [the boys'] medical and dental appointments. Not only their appointments, but their conditions. So, I don't know how to

treat them after something has been diagnosed." However, Cecil asked that he, as the custodial parent, be the only person that is allowed to go to routine dental and doctor visits because when he and Sara are both there, the boys "become immature for their age, and they run to [Sara] and cling to her to try and get out of the situation." Additionally, Sara is "[v]ery uncooperative" at appointments, "[s]he'll either try and take control of the show or she'll try and — and make it uncomfortable."

Dr. Jessica Meeske is a pediatric dentist and has been providing dental care for the parties' children since December 2011. She testified that the boys' dental visits are "stressful" for two reasons:

> The first is, is that the boys just have very age-inappropriate behavior, and it makes it difficult to provide both routine dental care as well as dental treatment and — and it takes two to three times as long. Their behavior also spills over to the other patients that are in the clinic or in the waiting room, which can cause a lot of anxiety for other families whose kids are there to be seen that day. The second reason that it becomes stressful is that [Cecil and Sara] in the past in — in the dental office have not always gotten along, and there's times that the focus is on the two of them not getting along as opposed to us being focused on trying to take care of the boys.

According to Dr. Meeske, "there was just a lot of hostility on [Sara's] part directed at [Cecil]." Cecil has "been very helpful" and has been willing to take advice regarding dental care suggestions. And when one of the boys is not behaving during a visit, Cecil is willing to take direction from the staff to step out of the examination room and allow them to work with the child one-on-one. As for Sara, Dr. Meeske testified that it was evident that she clearly loves her boys and wants to do what she can to help the children. However, her intentions are "misplaced" and she

> assumes the role of the helicopter parent and then it's very difficult for the boys to take direction from [staff]

because the boys act as the victim. And then [Sara] comes in and tries to act as the rescuer. And once the whole theatric starts, it's very hard to get the boys' attention, even for simple things like sitting in the chair and counting their teeth and doing a checkup, let alone treatment.

Dr. Meeske said that recently Sara has made "a better effort" to try to let the boys do more on their own, but "there's been so many negative dental experiences that, you know, now it's been three steps back."

According to Dr. Meeske, Sara also "point[s] the finger at [Cecil]" regarding problems with the boys' dental treatment or behavior, and she even goes so far as "trying to embarrass" him in the dental office. When the boys see that kind of interaction, it causes their behavior to get worse. Dr. Meeske has never observed Cecil "fighting back or picking fights" with Sara. On cross-examination, Dr. Meeske stated that the interaction between Cecil and Sara has "gotten a lot better." However, since 2014, there have been ongoing problems with the boys being apprehensive and scared at dental appointments. Cecil is willing to follow staff suggestions, but Sara's reaction (e.g., saying "don't push him if he doesn't want to do anything") causes the child's behavior to escalate. Dr. Meeske testified that it would be in the boys' best interests if Cecil brought the boys to her office. She is "more than willing to go the extra mile to communicate with [Sara] on the boys' care, whether that be by phone or e-email or if she wants to come in and visit . . . personally."

In an order filed on August 25, 2016, the district court generally found in favor of Cecil. After recounting the evidence from the modification hearing, the court said that most of Sara's energy is "focused on her anger over the divorce and alienating the children" and that "[s]he has been disruptive, controlling and rude during [parenting time] exchanges." "Based on the totality of the evidence," the court decided to "decrease some of her [parenting time] because she is not

acting in the best interests of the children in promoting their emotional growth." Accordingly, the district court sustained Cecil's "Cross-Complaint" to modify Sara's parenting time to every other weekend; her Tuesday and Thursday parenting times were terminated. "To reduce parental contact," the district court said Sara "shall deliver the children to the school bus on Mondays after her weekend [parenting time]." The court said it was "unable to set out specific parameters on behaviors to be met other than the parties should treat each other with respect in front of the children and not make disparaging remarks about each other." However, the court ordered Sara to attend and complete an anger management course and counseling "to address her co-parenting issues." The district court restricted Sara's participation in medical, dental, optometric, and dermatology appointments as follows:

> A. [Cecil] is not required to notify [Sara] of routine medical, dental, optometric and dermatology appointments. [Sara] may not participate in those appointments as the atmosphere she creates is not in the best interests of the children. [Cecil] shall advise [Sara] of the relevant information on the results of the visits by email or text message after they occur.

> B. Both parties shall advise each other of any emergency room visits as soon as possible.

Regarding names and contact information for childcare providers, the district court ordered the parties to notify each other of the names and contact information for "regular" paid providers; this does not include babysitters for short periods of time. Finally, the district court awarded $7,500 in attorney fees to Cecil, because Sara "prevailed on one issue, i.e., day care notification, which [Cecil] agreed to," and because "her modification was frivolous and she acted in bad faith by attempting to alienate the children and then asking for more parenting time." The court denied the parties' other requests. Sara's motion to set aside judgment and application for new trial was overruled. Sara now appeals.

## ASSIGNMENTS OF ERROR

Sara assigns, restated, that the district court erred by (1) admitting irrelevant evidence and excluding relevant evidence; (2) making no finding that a material change in circumstances occurred warranting this modification; (3) reducing, rather than increasing, her parenting time; (4) restricting her notifications of and participation in the children's appointments and activities; (5) ordering her to attend an anger management course and counseling; and (6) ordering her to pay $7,500 of Cecil's attorney fees.

## STANDARD OF REVIEW

[1,2] An appellate court reviews child custody determinations de novo on the record, but the trial court's decision will normally be upheld absent an abuse of discretion. *Flores v. Flores-Guerrero*, 290 Neb. 248, 859 N.W.2d 578 (2015). An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

[3] Parenting time determinations are also matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *State on behalf of Maddox S. v. Matthew E.*, 23 Neb. App. 500, 873 N.W.2d 208 (2016).

[4] In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

[5] In an action for modification of a marital dissolution decree, the award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed

in the absence of an abuse of discretion. *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014).

## ANALYSIS

*Errors Argued But Not Assigned.*

[6] Sara argues, but does not assign as error, that the district court (1) should have given her the first right to daycare, (2) was biased against her and denied her motion to disqualify the judge, and (3) overruled her motion to have a guardian ad litem appointed for the boys "to help the courts figure out what was in the boys' best interests." Brief for appellant at 21. To be considered by an appellate court, an error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *Mock v. Neumeister*, 296 Neb. 376, 892 N.W.2d 569 (2017). See, also, *Friedman v. Friedman*, 290 Neb. 973, 863 N.W.2d 153 (2015) (pro se litigant will receive same consideration as if represented by attorney, and pro se litigant held to same standards as one represented by counsel). Therefore, we will not address these arguments.

*Evidentiary Issues.*

Sara claims that the district court erred in admitting irrelevant evidence and excluding relevant evidence. We briefly address each of her claims in turn.

Sara argues that "[t]he trial court received unknown 'documents' handed to the Judge from [Cecil's] counsel during closing arguments that were unseen by [Sara]." Brief for appellant at 20. The record reflects that during closing arguments, Cecil's counsel approached the bench and stated, "Although I'm not offering it into evidence, I have drafted a proposed order for review." The record does not indicate whether a copy of the proposed order was previously given to Sara or whether she was given a copy at the time it was presented to the court. During closing arguments, Cecil's counsel discussed the evidence from trial alleged to support the proposed order. Although any case-related communication with the judge,

verbal or written, should include the presence of, or a copy to, the opposing party and/or his or her counsel, Cecil's proposed order was neither offered nor received as evidence. To the extent Cecil's counsel failed to provide a copy of the proposed order to Sara simultaneous to or in advance of providing it to the court, such practice is not to be condoned. However, Sara's suggestion that this was an evidentiary error is not supported by the record.

[7] Sara further asserts she was not given an opportunity "to do rebuttal oral arguments or written closing arguments." Brief for appellant at 20. As will be discussed later, the request made by Cecil's attorney during closing arguments that Sara be ordered to attend an anger management course and counseling came as a surprise to Sara, and therefore Sara claims she "did not have an opportunity to defend herself from [Cecil's] closing argument requesting this." *Id.* at 17. However, the conduct of final argument is within the discretion of the trial court, and a trial court's ruling regarding final argument will not be disturbed absent an abuse of discretion. See *Sundeen v. Lehenbauer*, 229 Neb. 727, 428 N.W.2d 629 (1988). We find no abuse of discretion here. The record reflects that both parties were treated equally and fairly by the court in this regard, and both parties were permitted to make closing arguments without any restrictions placed on their time. Further, after the district court's order was entered, Sara filed a "Motion to Set Aside Judgment and Application for New Trial," which specifically raised the issue that Sara did not have an opportunity "to defend herself against the order for these classes." Sara was then provided an opportunity to discuss all matters contained in her motion at the hearing scheduled for that purpose; the district court overruled Sara's requests in an order entered September 13, 2016. We will address the court's order on this issue in more detail later.

Sara also claims the court "relied on psychological assumptions of Sara made by a Pediatric Dentist" and considered actions that happened before the date of the decree. Brief for

appellant at 21. The record does not support Sara's claim the district court "relied on psychological assumptions" made by Dr. Meeske. The court did note Dr. Meeske's testimony that she observed hostility by Sara toward Cecil in the office, that Sara is a "'Helicopter Parent or Rescuer'" of the boys which causes them to act out, and that "[i]n the last 3 or 4 years this has happened more than once." It is true that things that happened "3 or 4 years" ago would have happened before the date of the decree. However, Dr. Meeske testified that there have been "ongoing" problems with Sara's actions at dental appointments which makes it difficult for staff to provide both routine dental care as well as dental treatment. The court did not err in considering the "ongoing" problems testified to by Dr. Meeske.

Sara argues that the court used "double hearsay from [Cecil]" to find that she alienated the boys from him. Brief for appellant at 21. We need not specifically address the "double hearsay" issue, because even without considering such statements (e.g., that Sara told the boys that Cecil lied to the judge), there was sufficient evidence to modify Sara's parenting time. See *Griffith v. Drew's LLC*, 290 Neb. 508, 860 N.W.2d 749 (2015) (erroneous admission of evidence in bench trial not reversible error if other relevant evidence, properly admitted, sustains trial court's necessary factual findings; in such case, reversal warranted only if record shows trial court actually made factual determination, or otherwise resolved factual issue or question, through use of erroneously admitted evidence).

The remainder of Sara's evidentiary allegations regarding statements made by the court, or evidence "ignored" by the court, brief for appellant at 23, do not go to the actual admissibility of evidence and therefore need not be discussed. See *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004) (in child custody cases, where credible evidence is in conflict on material issue of fact, appellate court considers, and may give weight to, fact that trial judge heard and observed witnesses and accepted one version of facts rather than another).

*Material Change in Circumstances
and Parenting Time.*

[8-11] The best interests of the children are the primary and paramount considerations in determining and modifying parenting time. *Fine v. Fine*, 261 Neb. 836, 626 N.W.2d 526 (2001); *State on behalf of Maddox S. v. Matthew E.*, 23 Neb. App. 500, 873 N.W.2d 208 (2016). The right of parenting time is subject to continuous review by the court, and a party may seek modification of a parenting time order on the grounds that there has been a material change in circumstances. *State on behalf of Maddox S. v. Matthew E., supra*. See, also, *Smith-Helstrom v. Yonker*, 253 Neb. 189, 569 N.W.2d 243 (1997). In the context of marital dissolutions, a material change in circumstances means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently. *Peterson v. Peterson*, 239 Neb. 113, 474 N.W.2d 862 (1991). The burden is upon the party seeking the modification of decree to show that there has been a material change of circumstances. See *Sullivan v. Sullivan*, 249 Neb. 573, 544 N.W.2d 354 (1996).

Sara asserts that the district court "failed to find any material change in circumstances that would warrant any modification." Brief for appellant at 11. Although the district court's order did not specifically say there had been a material change in circumstances, its order nevertheless included findings which implicitly established a material change in circumstances. The court pointed out Sara's behaviors in which she was "attempt[ing] to alienate the boys from [Cecil]." It went on to note, "The more time she gets, the more she wants. She is inflexible in her demands and most of her energy is focused on her anger over the divorce and alienating the children." Further, our de novo review of the record supports that there was a material change in circumstances affecting the boys' best interests, namely, that these parents needed a modified parenting plan that would minimize opportunities for ongoing conflict. See *State on*

*behalf of Maddox S. v. Matthew E., supra* (ongoing conflict can constitute material change in circumstances).

In fact, Sara and Cecil agreed that exchanges after her Tuesday and Thursday parenting time lead to conflict and "chaos" as evidenced by their testimony detailed above. However, they both proposed different solutions: Sara proposed that the court give her overnight parenting time on those nights, and Cecil proposed that the court take away her parenting time on Tuesday and Thursday evenings in exchange for an additional overnight of parenting time on her scheduled weekends. Either scenario would limit the majority of parenting time exchanges between the parties, because exchanges would essentially occur when the boys got on or off the school bus at the appropriate parent's home. However Sara's proposed plan of allowing her Tuesday and Thursday overnight parenting times would result in having the boys switch homes every weeknight; this schedule would not provide structure and stability to the boys' lives. The district court did not abuse its discretion by modifying the parenting plan to eliminate Sara's parenting time on Tuesday and Thursday evenings, and extending her scheduled weekends by adding another overnight of parenting time on Sunday.

*Children's Appointments and Activities.*

Sara argues that the district court erred in restricting her notifications of and participation in the boys' appointments and activities. Sara cites us to *Deacon v. Deacon*, 207 Neb. 193, 297 N.W.2d 757 (1980), *disapproved on other grounds, Gibilisco v. Gibilisco*, 263 Neb. 27, 637 N.W.2d 898 (2002), to support her claim that she should not be denied access to her children. However, *Deacon* is a case where the noncustodial parent was denied the right of parenting time, and it is not applicable here.

In its order, the district court denied Sara's request to require Cecil to notify her of medical, dental, and optometric appointments. The district court restricted Sara's participation

in medical, dental, optometric, and dermatology appointments as follows:

A. [Cecil] is not required to notify [Sara] of routine medical, dental, optometric and dermatology appointments. [Sara] may not participate in those appointments as the atmosphere she creates is not in the best interests of the children. [Cecil] shall advise [Sara] of the relevant information on the results of the visits by email or text message after they occur.

B. Both parties shall advise each other of any emergency room visits as soon as possible.

The court also denied Sara's requests to require Cecil to notify her of school programs, "as [Sara], as a parent, may obtain the school . . . calendar from the School District," and of any special or holiday church programs involving the children, because "as set out in the Decree, [Sara] is disruptive in [Cecil's] church" and "[s]he has the children every other Sunday, where she can participate with the children in her church."

Cecil has sole legal and physical custody of the boys. Having legal custody means that Cecil has the authority and responsibility for making fundamental decisions regarding the children's welfare, including choices regarding education and health. See Neb. Rev. Stat. § 43-2922(13) (Reissue 2016).

The district court did limit Sara's notification of and participation in "routine medical, dental, optometric and dermatology appointments." But the court ordered Cecil to advise Sara of the relevant information on the results of the visits by email or text message after they occur. Furthermore, Sara has a statutory right to access the boys' medical records. See Neb. Rev. Stat. § 42-381 (Reissue 2016) (unless court orders to contrary, each parent shall continue to have full and equal access to education and medical records of his or her child; either parent may make emergency decisions affecting health or safety of his or her child while in physical custody of such parent). After our de novo review of the record, including Dr. Meeske's testimony that Sara's presence interferes with the

staff's ability to work with the children, we find that the district court did not abuse its discretion in limiting notification of and participation in "routine medical, dental, optometric and dermatology appointments."

As to school and church programs, we are reviewing only whether Cecil should be required to notify Sara of such programs. As stated by the court, "[Sara], as a parent, may obtain the school . . . calendar from the School District." See, also, § 42-381 (unless court orders to contrary, each parent shall continue to have full and equal access to education and medical records of his or her child). As to the children's church programs, as noted by the district court, "as set out in the Decree, [Sara] is disruptive in [Cecil's] church." The decree reflects that at the hearing on dissolution, the minister of Cecil's church testified that Sara causes a commotion when she attends and that as a result, the minister "directed her away from the church." Since the entry of the original decree, Sara demonstrated a continued inability to be respectful toward Cecil in a public setting. At a basketball game in December 2014, the boys were standing by Sara when one of the boys asked her for money to buy candy. Sara spoke loudly, "so everybody [could] hear," and said, "I don't have any money. Your daddy took it all." Accordingly, we find the district court did not abuse its discretion when it denied Sara's request to require Cecil to notify her of school and church programs.

As noted, the court addressed only Cecil's obligation to notify Sara of these various school and church activities; the court did not prohibit her from attending them. Naturally, the best situation for the children is for both parents to be in attendance, in a supportive role, at such activities. However, this ideal cannot be achieved if one parent engages in disrespectful behavior toward the other parent in the presence of their children. Not only does this adversely impact the activity for their own children, but it also interferes with the enjoyment of the event by other children and their families. In this case, as in other cases the courts see too often, even though

both parents clearly love their children, they nevertheless fail to see how their inability to get along and cooperatively coparent is adversely impacting their children. Accordingly, it is not an abuse of discretion for a district court to use reasonable measures to minimize the harm of unresolved parental conflict on children.

*Counseling and Anger Management.*

Sara argues that the district court erred in ordering her to attend an anger management course and counseling. She says that this was not addressed at trial, that she did not have an opportunity to defend herself from Cecil's closing arguments requesting the order, and that she was not given the opportunity to give rebuttal closing arguments. She further argues that there is no evidence to support such an order by the district court.

[12] To the extent that Sara was "blindsided" by Cecil's request during closing arguments that she be ordered to attend an anger management course and counseling, Sara did not make an objection at the time the request was made. Further, we have already addressed that the district court has discretion with regard to the conduct of final arguments and also that Sara was able to raise and argue this particular issue at the hearing on her motion for new trial. Assuming without deciding that she properly preserved the issue for appeal, we find no abuse of discretion by the district court. See Neb. Rev. Stat. § 43-2929(1)(b)(ix) (Reissue 2016) (parenting plan shall include provisions for safety when preponderance of evidence establishes child abuse or neglect, domestic intimate partner abuse, *unresolved parental conflict*, or criminal activity directly harmful to child). See, also, Neb. Rev. Stat. § 43-2930(2)(e) (Reissue 2016) (after contested hearing, court shall enter temporary parenting order that includes, if appropriate, requirement that parent complete program of intervention for perpetrators of domestic violence, program for drug or alcohol abuse, *or program designed to correct*

*another factor as condition of parenting time*); Neb. Rev. Stat. § 43-2928 (Reissue 2016) (in all proceedings under Parenting Act, court may order second-level parenting education when factual determination of unresolved parental conflict has been identified; such course shall, among other things, include information about potentially harmful impact of unresolved parental conflict on child and use of effective communication techniques and protocols).

In his amended "Cross-Complaint," Cecil alleged that Sara had engaged in a pattern of taking out her anger at Cecil in front of their children; engaged in a course of action where she willfully and intentionally "poison[ed] the mind[s]" of their children; made false accusations about Cecil in front of their children in an attempt to make them angry or prejudice them against Cecil; engaged in disrupting behavior in front of their children; and engaged in behaviors wherein she set Cecil up for failure, embarrassment, or frustration in front of their children. Although Sara's attendance at an anger management course and counseling were not specifically requested prior to trial, Sara's anger and co-parenting issues were raised. Those issues were also addressed at trial. Although Sara presented testimony from witnesses who did not observe any disruptive behavior by Sara, Cecil testified and presented witness testimony to the contrary. For example, Cecil testified that Sara tells the boys they "can't go to a game because daddy won't let them." He further stated that the past 2 years, after having parenting time with Sara, the boys are sometimes upset with Cecil—they will yell at him, tell him that they hate him, and slam the door in his face. And Dr. Meeske testified that Sara "point[s] the finger at [Cecil]" regarding problems with the boys' dental treatment or behavior, and she even goes so far as "trying to embarrass" him in the dental office. When the boys see that kind of interaction, it causes their behavior to get worse. In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge

heard and observed the witnesses and accepted one version of the facts rather than another. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

Finally, Sara contends that the closing arguments from Cecil "brought in fictitious opinions from people that did not testify at trial as they referred to a Joel, Dr. Meidlinger and Mr. Snyder." Brief for appellant at 17. However, her argument is not supported by the record. During closing arguments, Cecil's counsel referenced a radio segment she heard on the way to court that morning ("Joel" was the speaker on the radio), as an analogy for the parties' situation; the words of "Joel" were not offered as an opinion. "Dr. Meidlinger" was appointed to perform a custody evaluation for the original divorce, and counsel made a passing reference to that opinion in her closing. During closing arguments, Cecil's counsel mentioned a discussion she had with "Mr. Snyder" (her co-counsel) about what could possibly be done to address Cecil's issues with Sara's behavior, and "Mr. Snyder" said that they should ask the court to order therapy for Sara. Accordingly, contrary to Sara's assertions, there were no "fictitious opinions" offered during closing arguments.

After our de novo review of the record, we cannot say the district court abused its discretion in ordering Sara to attend an anger management course and counseling to address her co-parenting issues. Second-level parenting education can be ordered for situations involving unresolved parental conflict. See § 43-2928. Also, when there is evidence of parental behavior which is harmful to a child, a court shall order provisions for the safety of a child as may be needed when a preponderance of the evidence establishes unresolved parental conflict. See § 43-2929(1)(b)(ix).

*Attorney Fees.*

Cecil submitted an affidavit and itemized bill from his attorney reflecting $17,582.84 in actual legal services and expenses since December 2014, as well as an estimate of an additional

$1,500 for attending the second day of the modification trial, for a total of $19,082.84. The district court ordered that Sara pay $7,500 of Cecil's attorney fees at a rate of $125 per month and that if her payments should "be delinquent for more than 30 days, the remaining amount due is converted to a [j]udgement" with interest accruing until paid.

Sara asserts the district court erred in ordering her to pay Cecil's attorney fees because (1) contrary to the court's finding, her complaint for modification was not frivolous or made in bad faith, and (2) she cannot afford to pay the fees.

[13] Attorney fees and expenses may be recovered only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees. *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014). Customarily, attorney fees are awarded only to prevailing parties or assessed against those who file frivolous suits. *Id*. A uniform course of procedure exists in Nebraska for the award of attorney fees in dissolution cases. *Id*. Thus, there was authority, in the present case, for the awarding of attorney fees to Cecil. See *id*.

[14] In awarding such fees, a court should consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services. See *id*.

The award of an attorney fee judgment against Sara in favor of Cecil was not an abuse of discretion, even without considering the district court's finding that Sara's modification action was frivolous. The original decree was filed in February 2014, and Sara filed the current complaint to modify custody in December of that year. Counsel for Cecil successfully challenged Sara's complaint to modify parenting time, and counsel pursued and succeeded in a "Cross-Complaint" for modification. As noted by the district court, Sara prevailed on one issue, the daycare notification, to which Cecil agreed.

These parties have been involved in extensive litigation since the entry of the decree in February 2014, and most of the litigation has been instigated by Sara. In addition to the current modification action, Sara filed two other modification pleadings regarding child support: a complaint to modify in June 2014 and a "Motion to Modify Order on Mandate" in December 2015. And this is the fourth appeal filed by Sara. She appealed the following: (1) the original decree (in an unpublished memorandum opinion, this court affirmed the district court's decision regarding custody, but reversed and remanded the child support determination for further proceedings, see *Schriner v. Schriner*, 22 Neb. App. xxv (No. A-14-371, May 22, 2015)); (2) the ruling on the June 2014 complaint to modify child support, which she filed 4 months after the decree was entered (in case No. A-15-055, in a minute entry dated October 5, 2015, this court dismissed Sara's appeal for lack of jurisdiction); (3) the ruling on her December 2015 "Motion to Modify Order on Mandate" as to child support (in case No. A-15-1223, in an order dated January 29, 2016, this court dismissed Sara's appeal for lack of jurisdiction); and (4) the current order on modification. At times, more than one appeal or complaint has been pending simultaneously. These ongoing actions have caused the parties to incur significant legal expenses, except for Sara when proceeding pro se.

Sara claims she cannot afford to pay Cecil's attorney fees in this action because her child support obligation takes her "well below poverty level" and she is already working two jobs. Brief for appellant at 23. The parties' specific financial situations were not discussed at the parenting time modification hearing. But according to the child support worksheet, Sara's monthly net income is $1,640.28. Her child support obligation is $321 per month, leaving her $1,319.28 per month. Payment of $125 per month toward attorney fees would not put her below the "[b]asic subsistence limitation" for one person, but does put her below "the [federal] poverty guidelines updated annually in the Federal Register" for a three-person household

(remembering that Sara has two other children from a prior relationship). See Neb. Ct. R. § 4-218 (rev. 2017). However, we are mindful that Sara received a $300,000 property settlement through mediation with Cecil in 2013. Under the circumstances of this case, we cannot conclude that an award of attorney fees to Cecil was an abuse of discretion.

## CONCLUSION

For the reasons stated above, we affirm the decision of the district court.

AFFIRMED.